**Danny HERNANDEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–94–00035–CR.**

Court of Appeals of Texas,
El Paso.

Jan. 4, 1996.

Discretionary Review Refused
April 3, 1996.

Francisco F. Macias, El Paso, for appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

LARSEN, Justice.

A jury found the appellant, Danny Hernandez, guilty of murder and sentenced him to confinement for ninety-nine years. Hernandez appeals his conviction in five points of error complaining about the security measures undertaken during trial, media influence on jurors, the failure to instruct the jury on requested defenses, the denial of an additional peremptory strike, and the state's mention of extraneous offenses. We affirm.

## FACTS

Around midnight on July 6, 1992, Danny Hernandez's house was the target of a drive-by shooting. In the house at that time were certain members of the Hernandez family and some friends. The appellant, Hernandez, was a couple of blocks away, but heard the shots and arrived home in time to see a white Monte Carlo leaving the area. Some of the occupants of the house said the shots came from a white Monte Carlo. Hernandez and six others jumped into an Oldsmobile owned by Hernandez and went looking for the Monte Carlo. Although it was denied, two of the occupants of the Monte Carlo, Andres Gonzalez and Luis Lopez, were purportedly members of the Cholito Posse Gang. The third occupant of the Monte Carlo, the victim, Juan Aguilar, was purportedly a member of the Barrio Campestre Locos Gang. Hernandez denied that he belonged to a gang at the time of the offense here, but admitted formerly belonging to the Cholito Posse. Other testimony indicated that Hernandez was currently a member of the Original Mobster Gang.

The occupants of the Oldsmobile eventually located a white Monte Carlo. A high speed chase ensued during which shots were exchanged between the vehicles. Ultimately, the Oldsmobile crashed into the rear of the Monte Carlo. Following the crash, all seven occupants of the Oldsmobile fled the scene. Lopez and Gonzalez hid in a near-by irrigation ditch until the emergency services vehicles arrived. Aguilar had been wounded and was still in the backseat of the Monte Carlo. Aguilar died on August 31, 1992 as a result of

a gunshot wound to the head. Hernandez was charged with murder.

### Public Trial

Hernandez first contends that the security measures undertaken for his trial were calculated to exclude a certain segment of the community and therefore violated his right to a public trial. Following the swearing of the jury but prior to opening statements, Hernandez objected that the sheriff's department was requiring trial spectators to be photographed prior to entering the courtroom. Hernandez complained that these security measures would be harmful to him when observed by the jury and would also have a chilling effect on the public's access to the courts.

In response, the trial court noted that because the case involved three local gangs, and because significant gang activity had occurred during the previous trial of Hernandez's codefendant, additional security was necessary. The trial judge explained that he asked the sheriff to provide security by whatever means the sheriff thought necessary to prevent similar activity from occurring during this trial. The court overruled Hernandez's objection and allowed the photo-taking to continue. The court required, however, that the photo-taking be conducted away from the windows to prevent being viewed by the jury. The court noted that the jury was unaware of the photo-taking security measures and observed that there was no apparent chilling effect on the public because the courtroom was filling with spectators.

Following his conviction, Hernandez moved for a new trial alleging, among other things, that his right to a public trial had been violated by the courtroom security measures. At the hearing on his motion, the trial court articulated its particularized reasons for requesting additional security. The court noted that it learned in talking to the jurors following the trial of the co-defendant that they were intimidated by the number of gangs involved in the case. The court itself had observed during the co-defendant's trial that the courtroom "was full of what appeared to be gang members" who stared at the jury during the proceedings. The court learned from the jury after trial that these gang member-types also followed the jury to the cafeteria and stared at them as they went through the food lines. In addition, the court relayed learning that the gang member-types were meeting the jurors as they came across the skywalk from the parking garage and "giving [the jurors] a pretty good stare and a mad-dog stare or something like that as they were coming across."

Evidence presented at the hearing showed that thirty-one individuals were photographed. Sheriff Leo Samaniego testified that a usual security measure for a gang-related trial would be to make a video-recording of those entering the courtroom. He indicated that the alternate use of still-photography would also be an appropriate security measure. The sheriff further testified that the primary purpose of taking the photographs was to have a record of those who were present should something untoward occur.

Not every person entering the courtroom was photographed.[1] In particular, one witness testified that she was not photographed prior to entering the courtroom, but further stated that she had identified herself as an assistant public defender to the sheriff's deputies taking the photos (the public defender's office represented Hernandez at trial). Only one witness, a schoolmate of Hernandez, testified that she did not attend the trial because she did not want her picture taken by the sheriff's department. The other two witnesses who testified on the issue were deterred from attending the trial for reasons other than being photographed.

The barring of some members of the public from the courtroom does not necessarily mean that an accused has been denied a public trial; that determination is based on the particular circumstances of the case. *Levine v. United States,* 362 U.S. 610, 616–17, 80 S.Ct. 1038, 1042–43, 4 L.Ed.2d

---

1. The proof sheet showing the photographed spectators fails to suggest that potential gang members were specifically targeted; rather the variety of those photographed indicates random selection.

989, 995 (1960). Hernandez urges the Court to apply a Batson-type analysis, arguing that the right to a public trial is both a right of the defendant and a right of the public to view and participate in the judicial process.[2] While we do not disagree with this approach, nevertheless, we note that neither the right of an accused nor of the citizenry to a public trial is absolute. *Addy v. State*, 849 S.W.2d 425, 429 (Tex.App.—Houston [1st Dist.] 1993, no pet.). Whether the right to a public trial has been infringed is better determined by balancing the interests involved. *See id.* Reasonable limitations on public attendance may be imposed where they are necessary to protect a state interest that outweighs the defendant's right to public scrutiny. *Mosby v. State*, 703 S.W.2d 714, 716 (Tex.App.—Corpus Christi 1985, no pet.).

We find the security measures used during this trial did not violate Hernandez's right to a public trial here. Protecting the jury from intimidation that would traumatize them or render them unable to perform their duties as jurors is an overriding state interest sufficient to justify partial exclusion of the public from trial. *See id.* (holding appellant's right to public trial was not violated by court's outright exclusion of non-participants because of the extremely sensitive nature of the evidence being developed and youthful age of the witness); *see also Addy*, 849 S.W.2d at 429 (holding appellant's right to public trial was violated by outright exclusion of appellant's friends from courtroom; trial court removed appellant's friends under "exclusion of witnesses rule" after state inquired of them their names and then added those names to its witness list solely for purpose of excluding them; trial court failed to articulate compelling reason for exclusion and could not rely on "the Rule" under these circumstances). The trial court articulated on the record its concern that the jury be free from the intimidation experienced by the

jurors in the co-defendant's trial. In addition, no member of the public was specifically excluded from attending the trial but simply had to submit to being photographed to gain entrance. Photographic recording is a common form of security in today's society; the public regularly submits to such measures in public buildings, banks, and convenience stores. Requiring that court spectators be photographed under these circumstances is not such an imposition on the public as to effectively close the trial. Moreover, because the record shows that at least thirty-one individuals attended the trial, these security measures do not appear to have had a chilling effect on public attendance.[3] Point of Error One is overruled.

### *Jurors Given Newspapers*

■ In his second point of error, Hernandez contends he was denied his due process right to a fair trial because the trial court improperly supplied jurors with daily newspapers containing inflammatory articles regarding crime and thereby allowed the jurors to be influenced by the media. As an initial matter, Hernandez fails to offer any authority to support his position that he has been denied a constitutionally fair trial. Consequently, his argument fails to comport with Texas Rule of Appellate Procedure 74(f). This alone is sufficient to justify overruling his second point of error. *Burks v. State*, 876 S.W.2d 877, 910 (Tex.Crim.App. 1994), *cert. denied*, ── U.S. ──, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995). In the interest of justice, we nevertheless address his argument.

Hernandez was tried from December 20 through December 23, 1993. The evidence adduced on this issue at the hearing on the motion for new trial shows that the court provided a copy of the *El Paso Times* to the

---

**2.** Hernandez asserts the trial court and sheriff's department systematically attempted to exclude those whom they believed to be gang members "in order that the jury would be more inclined to sentence at the higher end of the punishment scale and to preclude Defendant from having a group of public supporters...." Hernandez charges that the trial court, by ratifying the security measures, intended to send a message to Hernandez's friends that if they attended the

trial, "they would have their picture taken, and be targeted in criminal prosecutions." Hernandez cites to no portion of the record supporting this allegation.

**3.** The trial court noted that it believed at least five of those thirty-one spectators were aligned with Hernandez.

jury on the second, third, and fourth days of trial. Prior to providing the jurors with the newspaper, the trial judge and his bailiff excised "anything that might be related to Danny Hernandez's case." At the close of testimony each day, the trial court also admonished the jury to avoid reading, watching, or listening to media accounts of this case.[4]

Hernandez appears to argue that the court violated his right to a fair trial and fair sentencing by providing the jury with a newspaper during the trial. Hernandez concedes that the court-provided newspapers contained no articles related to his trial. He nevertheless urges that because the papers contained a number of other crime-related articles, the court inserted inflammatory matters into the trial process and influenced the jury into both convicting him and assessing the maximum sentence.

This argument is without merit. Testimony adduced from jurors confirmed that the court-provided newspapers had been edited. None of the articles complained of concerned Hernandez's trial; consequently, jurors would not have violated the court's admonishments regarding media accounts of this case by reading any of those same articles in newspapers not provided by the court.

Moreover, none of the jurors testified that they read the challenged articles in the papers provided by the court.[5] More importantly, none of the jurors testified that any headline or article influenced their decisions on guilt or sentencing. The record simply does not support Hernandez's contention that the trial court improperly influenced the jury by providing newspapers that contained articles unrelated to his case. Accordingly, the second point of error is overruled.

### Defense of Property and of Third Person

■ In a multifarious point of error, Hernandez next claims that the trial court erred in failing to include instructions on defense of property and defense of a third person. When properly requested, a defendant is entitled to a charge on every defensive theory raised by the evidence, regardless of the strength of the evidence or whether it is controverted. *Musick v. State*, 862 S.W.2d 794, 797 (Tex.App.—El Paso 1993, pet. ref'd).

■ The defense of protection of property is defined by Texas Penal Code §§ 9.41 and 9.42. Section 9.41 provides, in relevant part, that a person in lawful possession of land is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to prevent or terminate the others' trespass on the land. TEX.PENAL CODE ANN. § 9.41(a) (Vernon 1994). A person is justified in using *deadly* force against another to protect property (1) if he would be justified in using force against another under TEX.PENAL CODE ANN. § 9.41; and (2) he reasonably believes the deadly force is immediately necessary to prevent the others' imminent commission of criminal mischief during the nighttime; and (3) he rea-

4. At the close of testimony on December 20, 1993, the trial court admonished the jury in part: "Also this evening while you are home, you will not read any newspaper articles about this case or listen to any radio or television accounts of this case if there are any. The best thing to do right now is probably not to listen to any local news on television at all, just listen to the network news like CNN or something like that. And if you are riding in the car tomorrow morning and there is anything on the radio, just turn it off if they start coming on with the news on the radio, or way down, so just don't listen to the news on the radio. We will have newspapers here for you tomorrow that you can read and we will have gone through those to make sure there is nothing objectionable in there."

At the close of testimony on December 21, 1993, the trial court admonished the jury in part: "Do not read any newspapers that we don't provide you here in the courthouse. Do not listen to any radio or television accounts of this case if there are any. And I think in this case my instructions were basically just to watch national news and catch up on the local news after the case is over."

Finally, at the close of all the evidence on December 22, 1993, the trial court admonished the jury in part: "Again while you are outside of the courthouse this evening, do not talk about this case with anyone or allow anyone to discuss it in your presence. Also, don't listen to any radio or television accounts of the case if there are any or listen to any local news or read any local newspapers."

5. Of the three jurors who testified, only one acknowledged having read one of the articles, but indicated that he read it at home in the evening.

sonably believes that the property cannot be protected by any other means. TEX.PENAL CODE ANN. § 9.42 (Vernon 1994).

Without specific reference to the record, Hernandez argues that the issue of defense of property was raised by evidence that his house had been the target of a drive-by shooting and his testimony that he was concerned that the perpetrators might return and harm his family. This evidence is insufficient, however, to entitle him to an instruction on defense of property because there is no evidence of *imminent* criminal mischief; the drive-by shooting of the Hernandez home had already been completed prior to Hernandez's use of deadly force. *Jackson v. State,* 753 S.W.2d 706, 710 (Tex.App.—San Antonio 1988, pet. ref'd); *see also, Molitor v. State,* 827 S.W.2d 512, 521–22 (Tex.App.—Austin 1992), *appeal abated,* 862 S.W.2d 615 (Tex. Crim.App.1993) (holding defense instruction on deadly force to protect property not warranted where no evidence of imminent commission of arson, burglary, robbery, theft, or criminal mischief); *Jones v. State,* 680 S.W.2d 25, 28 (Tex.App.—Houston [1st Dist.] 1984), *rev'd on other grounds,* 706 S.W.2d 664 (Tex.Crim.App.1986) (no evidence to indicate defendant shot complainant to protect appellant's property; theft, if any, had occurred prior to confrontation). In addition, nothing in the record supports the conclusion that additional criminal mischief was contemplated or in imminent danger of being committed. *See Jackson,* 753 S.W.2d at 710. To the contrary, the evidence indicates that the occupants of the Monte Carlo were attempting to get away but were being pursued by Hernandez and his friends.

Hernandez further asserts that the jury should also have been instructed on defense of a third person because evidence showed that members of the Hernandez family were home during the drive-by shooting, and there was also testimony that the occupants of the Monte Carlo fired at the Oldsmobile Hernandez and his friends were in during the chase. A person is justified in using deadly force against another to protect a third person if, under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.32 in using deadly force to protect himself against the unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect, and the actor reasonably believes his intervention is immediately necessary to protect the third person. TEX.PENAL CODE ANN. § 9.33 (Vernon 1994).

We need not address whether the court erred in failing to give the requested instruction on defense of third persons because the error, if any, was harmless. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The trial court instructed the jury on self-defense. The jury, however, found Hernandez guilty of murder. By finding him guilty of murder, the jury implicitly rejected Hernandez's self-defense theory. *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App. 1991). This negative finding by the jury on the question of self-defense precludes the possibility that Hernandez was justified in using deadly force to defend a third person. *See Curtis v. State,* 754 S.W.2d 460, 462 (Tex.App.—Dallas 1988, pet. ref'd). Under these circumstances, that is, because the jury considered and rejected Hernandez's claim of self-defense, any error in failing to charge the jury on defense of a third person was harmless. Moreover, as the evidence demonstrates that Hernandez was the aggressor in this altercation, it is doubtful whether he was entitled to an instruction on self-defense in the first instance. *See Witty v. State,* 150 Tex.Crim. 555, 203 S.W.2d 212, 218 (App. 1947). Hernandez's third point of error is overruled.

### Objectionable Juror Seated

In his fourth point of error, Hernandez contends that the trial court erred in denying him an additional peremptory strike and forcing him to accept an objectionable juror by refusing to strike for cause juror number twenty-nine, who could not consider probation in a gang-related case. The state contends that Hernandez failed to preserve this complaint for appellate review. To preserve reversible error in regard to the denial of a requested challenge for cause, the defendant must show: (1) that he was forced to use a peremptory strike on a juror who was challengeable for cause; (2) that he exhaust-

ed all of the peremptory strikes he was given; (3) that his request for additional peremptory strikes was denied; and (4) that he was forced to accept a juror whom he found objectionable. *Laca v. State,* 893 S.W.2d 171, 181 (Tex.App.—El Paso 1995, pet. ref'd).

The record shows that Hernandez challenged juror number twenty-nine for cause, that his challenge was denied, that he moved for an additional peremptory strike, and that his request was denied. Hernandez also asserted on the record that he had to use a peremptory strike on juror number twenty-nine, and was thus forced to accept objectionable juror number thirty-one.[6] This is insufficient, however, to preserve error because the record does not also reflect that Hernandez exhausted all of his peremptory strikes. Hernandez did not make the jury strike sheets a part of the record on appeal and the statement of facts does not reflect any assertion that all of his peremptory strikes were used. Accordingly, Hernandez failed to preserve error; his fourth point of error is overruled.

### *Prosecutorial Misconduct*

■ In his fifth point of error, Hernandez contends he was denied a fair trial due to prosecutorial misconduct. Citing the cross-examination of Yolanda Soledad, Hernandez specifically complains that the prosecutor improperly alluded to extraneous offenses by suggesting that the drive-by shooting of the Hernandez residence may have been in retaliation for past drive-by shootings perpetrated by Hernandez. Hernandez contends that the comments violated his motion in limine and were made without proper notice of the state's intent to use extraneous offenses.

We do not reach the substance of the complaint because Hernandez failed to preserve error.

■ In order to preserve error in cases of prosecutorial misconduct, the defendant must (1) make a timely and specific objection; (2) request an instruction that the jury disregard the matter improperly placed before the jury; and (3) move for a mistrial. TEX.R.APP.P. 52(a); *Cook v. State,* 858 S.W.2d 467, 473 (Tex.Crim.App.1993); *see Huffman v. State,* 746 S.W.2d 212, 218 (Tex. Crim.App.1988) (defendant must object that the prosecutor's question was clearly calculated to inflame the minds of the jury and was of such a character so as to suggest the impossibility of withdrawing the impression produced).

During cross-examination, the prosecutor questioned Hernandez's sister-in-law, Yolanda Soledad, about a particular car owned by Hernandez that had New Mexico license plates. The prosecutor then asked: "That's not the car that they use for their drive-by shootings with New Mexico plates, is it?" Soledad responded that she did not know whether they went drive-by shooting or not. No objection was made during this questioning. Later, during recross examination, the prosecutor questioned Soledad about her lack of knowledge of the actions of Hernandez and his friends.

Q: But you don't know what they did earlier in the evening, do you?

A: No, I don't.

Q: As a matter of fact you don't know what they did the night before?

A: No, I don't.

Q: Isn't it also just as possible, ma'am, that Frosty [Hernandez,] Shooter, Booker, Draw Down, and Cashew did a drive-by on some other house the night before, and this is just gang retaliation like he's trying to argue it is today?

A: I didn't know that.

Q: It's a possibility, though, isn't it, ma'am?

---

**6.** In ruling on Hernandez's objection to the jury panel, the following exchange occurred:

The Court: Let me ask you this; did they strike anybody—did the defense strike anybody over juror Number 31? Did they use a preemptory strike outside of juror No. 31?
The Clerk: The defendant struck 43.
The Court: Okay. Your objection is overruled. Okay. Bring in the panel.

Mr. Dekoatz: I just wanted to put on the record that we were forced to take objectionable juror No. 31.
The Court: But you could have used a strike you used on Juror No. 40, something to strike that person. That's all I'm pointing out to you on the record.

A: I don't know.

Q: Because you didn't know they were in a gang, did you?

A: No.

Q: So you don't even know what they were out there doing, do you?

A: No.

Q: They could have been doing drive-bys, right?

A: Maybe.

This testimony was admitted without objection. Although Hernandez contends that the prosecutor violated the motion in limine, neither the granting nor denial of a motion in limine is alone sufficient to preserve error for appellate review.[7] *Ortiz v. State*, 825 S.W.2d 537, 541 (Tex.App.—El Paso 1992, no pet.). Error is properly preserved by objecting at the very time the alleged misconduct occurs before the trier of fact. *See id.* Because Hernandez failed to object, no error is preserved for appellate review. *See* TEX. R.APP.P. 52(a); *Ramirez v. State*, 873 S.W.2d 757, 762 (Tex.App.—El Paso 1994, pet. ref'd). Accordingly, his fifth point of error is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.

---

7. Nothing in this opinion should be read as condoning flagrant violations of limine orders such as that engaged in here. To the contrary, we strongly condemn this tactic.