Opinion issued July 9, 2009
 















     






In The
Court of Appeals
For The
First District of Texas




NO. 01-07-01062-CR
NO. 01-07-01085-CR
NO. 01-07-01086-CR




JIMMY DALE TRUITT, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 278th District Court
Grimes County, Texas
Trial Court Cause Nos. 14,255; 16,107; 16,109




 
MEMORANDUM OPINIONA jury convicted appellant, Jimmy Dale Truitt, of aggravated assault with a
deadly weapon


 and unlawful possession of a firearm by a felon.


 See Tex. Penal
Code Ann. §§ 22.01(a)(1), 22.02(a)(2), 46.04(a)(1) (Vernon Supp. 2008). The cases
were consolidated for trial. The jury assessed punishment at 18 years in prison for
aggravated assault and 10 years in prison for unlawful possession of a firearm. In a
hearing held during jury deliberations, the trial court also revoked the probation of
appellant’s three-year sentence for a previous conviction of aggravated assault.


 In
four issues, appellant contends that: (1) the evidence supporting his convictions is
legally and factually insufficient; (2) the trial court erred by allowing the State to
impeach its own witness with a prior inconsistent statement made to another witness;
(3) the trial court erred by allowing the prosecutor to engage in misconduct during
trial; and (4) the trial court denied appellant a fair probation revocation hearing. We
affirm.
Background
Complainant’s Testimony 
          The complainant, Travis Carleton, and his family lived with another couple,
Janice and JR Homeier. On November 10, 2006, the Homeiers hosted several out-of-town relatives. The group built a campfire, and Carleton testified that everyone was
“outside around the fire drinking and having a good time.” At some point during the
evening, Carleton testified, “[the people at his home] heard somebody yelling” in a
friendly manner from another home down the street, and they began “yelling back.”
          Carleton testified that the yelling continued for “[n]ot even a minute” and that,
immediately after it stopped, he saw two people he did not recognize, who appeared
“pretty intoxicated[,] . . . walking from that house towards ours.” The individuals,
one of whom Carleton identified in court as appellant, entered the party and then
“introduced themselves and started being obnoxious.” Later that night, appellant “all
of a sudden” asked who lived at the house, and Carleton told appellant that he lived
there. Carleton testified that appellant then asked him, “[W]here is your old lady
at[?]” and referred to Carleton’s wife as a “f***ing bitch.”
          Appellant then shoved Carleton, and Carleton punched appellant in the mouth.
The two fought, Carleton testified, for about “[t]hirty seconds” before being
separated. Appellant then left the party, and Carleton “went back into the house to
clean up [his] hand.” Carleton testified that, while he was inside the house, he heard
Janice Homeier “yelling from outside, who are you, what do you want. [sic] What do
you want, what are you doing here. [sic]”
          Carleton “immediately ran right back outside,” where he saw a “black or dark
blue” car “parked in front of the driveway . . . just stopped in the middle of the road.”
Carleton testified that he approached the car, which had its driver’s side window
down, and saw appellant “bent into the center console and he looked up over his
shoulder at me. And I locked eyes with him and I heard him say there is that mother
f***er.” Carleton began to back away from the car and heard a gunshot. A bullet
struck and shattered Carleton’s femur. Carleton testified that he did not see the gun
because he “was too busy getting away.”
Other Testimony
          That an altercation took place between appellant and Carleton at Carleton’s
house is uncontroverted. Several witnesses who were at the party testified that, soon
after appellant fought with Carleton and left, a dark-colored car stopped in front of
the house. JR Homeier, who lives with Carleton, and Mary Ann Solis, one of the
party guests, both testified that they saw appellant point a firearm in Carleton’s
direction from the window of the car and fire it. Homeier testified that he saw “a
pistol come out the window [of the car] and [appellant’s] face come out the window
. . . [and] a big blast and it just lit up everywhere.” Solis testified that she saw both
a gun and a muzzle flash, and she identified appellant as the person holding the gun. 
          Another party guest, Paul Foreman, testified that “[Carleton] walked up and the
person in the car said you’re the mother f***er I’m looking for” and then he heard a
gunshot. Foreman further testified that he recognized the voice as appellant’s “[f]rom
earlier when he was there at the fire [at the party].”
          Captain Greene of the Grimes County Sheriff’s Office testified that he
interviewed Carleton approximately five days after the shooting. Greene testified that
he showed Carleton a photo lineup and that Carleton, within a “[c]ouple of seconds,”
identified appellant as the person who shot him.
          John Bell, a friend of appellant’s who was also present, testified that appellant
was driving a black Toyota on the night of the shooting. Bell further testified that,
after the fight between appellant and Carleton, he drove appellant, who lived nearby,
home in appellant’s car; gave appellant’s car keys to appellant’s wife, Shannon Truitt;
and left on foot for another friend’s house. Bell testified that, while he was walking,
he heard a gunshot just before a dark-colored car came “flying by.” One of the
investigating officers, Captain Greene, testified that, on the night of the shooting, Bell
told him that the dark-colored car was appellant’s.



          Shannon, appellant’s wife, testified that, after Bell brought appellant home,
appellant “fell asleep on the couch” with her and one of their children. The next
morning, Shannon testified, she and appellant “call[ed] around and [found] out” that
a warrant had been issued for appellant’s arrest. Shannon testified that appellant later
turned himself in.   
Legal and Factual Sufficiency
          In his first issue, appellant challenges the legal and factual sufficiency of the
evidence supporting his convictions.


 Specifically, appellant argues that his
conviction should be reversed because “[t]here was so much contradictory evidence
and so little evidence actually supporting a reasonable inference that [appellant]
committed the offense[s] . . . . [emphasis in original]”
Standard of Review—Legal Sufficiency
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict and determining whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt.
Cruz v. State, 238 S.W.3d 381, 386 (Tex. App.—Houston [1st Dist.] 2006, pet. ref’d)
(citing King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)). The trier of fact
is the sole judge of the weight and credibility of the evidence. Margraves v. State, 34
S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency
review, we may not reevaluate the weight and credibility of the evidence and
substitute our judgment for that of the factfinder. Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in
favor of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
Standard of Review—Factual Sufficiency
          When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will set
aside the verdict only if (1) the evidence is so weak that the verdict is clearly wrong
and manifestly unjust or (2) the verdict is against the great weight and preponderance
of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the
first prong of Johnson, we cannot conclude that a conviction is “clearly wrong” or
“manifestly unjust” simply because, on the quantum of evidence admitted, we would
have voted to acquit had we been on the jury. Watson v. State, 204 S.W.3d 404, 417
(Tex. Crim. App. 2006). Under the second prong of Johnson, we cannot declare that
a conflict in the evidence justifies a new trial simply because we disagree with the
jury’s resolution of that conflict. Id. Before finding that evidence is factually
insufficient to support a verdict under the second prong of Johnson, we must be able 
to say, with some objective basis in the record, that the great weight and
preponderance of the evidence contradicts the jury’s verdict. Id. In conducting a
factual-sufficiency review, we must also discuss the evidence that, according to the
appellant, most undermines the jury’s verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.
Crim. App. 2003).
          A jury is in the best position to evaluate the credibility of witnesses, and we are
required to afford “due deference” to the jury’s determinations. Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006). The jury is free to accept or to reject any
or all of the evidence presented by either side. Saxton v. State, 804 S.W.2d 910, 914
(Tex. Crim. App. 1991).  Reconciling conflicting testimony is within the exclusive
province of the jury. Goodman v. State, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001).
Discussion
          A person commits the offense of aggravated assault when he intentionally,
knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly
weapon while doing so. Tex. Pen. Code Ann. §§ 22.01(a)(1), 22.02(a)(2) (Vernon
Supp. 2008). A person commits the offense of unlawful possession of a firearm when
he possesses a firearm after he has been convicted of a felony and before the fifth
anniversary of his release from confinement following conviction or his release from
supervision under community supervision, parole, or mandatory supervision,
whichever date is later. Id. § 46.04(a)(1) (Vernon Supp. 2008). “Possession” means
actual care, custody, control, or management. Id. § 1.07(39) (Vernon Supp. 2008).
During the guilt/innocence phase of trial, the trial court admitted into evidence a
judgment indicating that appellant had pleaded guilty to aggravated assault in another
case and was placed on probation for five years, beginning January 7, 2002.
          During the State’s case, two witnesses testified that they saw appellant
discharge a firearm in Carleton’s direction, and Carleton testified that he was
hospitalized because a bullet shattered his femur. Based on that testimony, a rational
trier of fact could have found the essential elements of the offenses beyond a
reasonable doubt. We conclude that appellant’s convictions were supported by legally
sufficient evidence.
          Appellant contends on appeal that the accounts of the State’s witnesses are not
credible because they contain inconsistencies. He also points out that “no witness
ever told Captain Green [sic] that [appellant] was the shooter.” The jury is the sole
judge of the credibility of witnesses and may choose to believe some testimony and
disbelieve other testimony. Lancon v. State, 253 S.W.3d 699, 707 (Tex. Crim. App.
2008) (citing Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)). We
afford almost complete deference to a jury’s evaluation of credibility. Lancon, 253
S.W.3d at 705 (citing Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App.
2006)). The jury clearly believed the testimony of the State’s witnesses and
disbelieved that of appellant’s wife, who said that he was with her at the time of the
shooting. We defer to the jury’s determination that the State’s witnesses were credible
and that appellant’s wife was not.
          Viewing the relevant evidence in a neutral light, favoring neither the State nor
appellant, and with appropriate deference to the jury’s credibility determinations, we
conclude that the evidence supporting the jury’s verdict is not too weak to support the
jury’s finding of guilt beyond a reasonable doubt and that the weight of the evidence
contrary to the verdict is not so strong that the State could not have met its burden of
proof. Pena v. State, 251 S.W.3d 601, 609–10 (Tex. App.—Houston [1st Dist.] 2007,
pet. ref’d). Accordingly, we conclude that appellant’s convictions were supported by
factually sufficient evidence.
          We overrule appellant’s first issue.
Impeachment
          In his second issue, appellant contends that the trial court erred by allowing the
State to impeach its own witness with a prior inconsistent statement made to another
witness. 
The Testimony 
          The State called John Bell, a friend of appellant’s, who testified that he took
appellant home in appellant’s car, gave appellant’s car keys to appellant’s wife, and
began to walk toward a friend’s house. Bell further testified that, while he was
walking, he “heard a loud pow” then “saw a car flying by . . . [and] dove in the bushes
. . . [b]ecause [the car] was driving erratically.” 
          On redirect, the following exchange took place:
[Prosecutor]: Do you remember being interviewed by a police officer, Todd
Greene, over at Mr. Hamner’s house or after the shooting out there?

          [Bell]: Yes, sir, I guess so. If that was him, I don’t know.

          [Prosecutor]: And you gave a written statement, right?

          [Bell]: Yes, sir.
 
[Prosecutor]: And isn’t it true that you told Officer Greene that that was Jimmy
Dale Truitt’s car that sped past you?

          [Bell]: No, sir, I did not.
 
[Prosecutor]: So you’re saying unequivocally you never told Todd Greene that
that was Jimmy Dale Truitt’s car that sped past you?

          [Bell]: Yes, sir, I did not. 

          Later, the State called Captain Greene. The following exchange took place
during the State’s direct examination of Greene:
          [Prosecutor]: And during your oral conversation with John Bell do you recall
him talking to you about walking back and a car passing him?

          [Greene]: Yes, I do.
 
[Prosecutor]: And can you tell the jury what it was that John Bell told you in
describing the vehicle that passed him.

          [Greene]: When he was walking back from the—

          [Defense counsel]: Object to hearsay.
 
[Prosecutor]: Offered to impeach his testimony in response to the defense that
he never told anybody that it was Jimmy Truitt’s car.

          [The Court]: Overruled.

          [Prosecutor]: Go ahead.
 
[Greene]: Mr. Bell said he was walking back from the party and as he was
walking down the road Jimmy Dale’s car drove past him.

          [Prosecutor]: He specifically said it was Jimmy Dale’s car?

          [Greene]: Yes, he did.

Waiver 
          Appellant argues that the trial court erred by overruling his objection because
the State called Bell solely to elicit testimony that would be impeachable by the
otherwise inadmissible hearsay testimony related by Greene. We conclude that
appellant did not preserve error. Appellant merely made a hearsay objection and did
not in any way convey to the trial court the complaint he now raises on appeal.
Miranda v. State, 813 S.W.2d 724, 737 (Tex. App.—San Antonio 1991, pet. ref’d)
(holding objections to hearsay and improper predicate were insufficient to preserve
complaint that State called witness solely to later get inadmissible hearsay before jury
under guise of impeachment); cf. Kelly v. State, 60 S.W.3d 299, 300, n.1 (Tex.
App.—Dallas 2001, no pet.) (concluding that error was preserved on identical
complaint when counsel objected to “improper impeachment . . . intended to elicit
inadmissable [sic] hearsay”). We overrule appellant’s second issue.
Prosecutor’s Conduct
          In his third issue, appellant contends that the prosecutor engaged in misconduct
while cross-examining appellant’s wife, Shannon.
The Testimony
          On direct examination, appellant’s wife, Shannon, testified as follows:
          [Defense counsel]: Okay. So there is [sic] doors on each side of your home?
 
[Shannon]: Yes. There is a sliding glass door that is the back door. Sherry
[appellant’s sister] had come up to there and she—I told her that—I told her to
come inside real quick because I thought them people [sic] were—I told her
about them people [sic] were banging on my door awhile ago. But she told me
that it was—she thinks it was the cops because they were just at Judy Truitt’s
house, which is his mother. So they—she told me who they were and then she
left. And then I told Jimmy Dale that I think [sic] it was the cops. So it was in
the middle of the night so we waited until the next morning to call around and
find out what was going on. And then that’s when we found out he had a
warrant on that.
 
[Defense counsel]: And then he subsequently turned himself in to law
enforcement, correct?

          [Shannon]: Yes, sir. 

          On cross-examination, Shannon gave the following testimony:
[Prosecutor]: It’s your testimony that Jimmy Dale turned himself in the next
day?
 
[Shannon]: I’m not sure the following day. I think it was like a couple of days
afterward.

          [Prosecutor]: Wasn’t it like a week later?

          [Shannon]: I don’t know. I don’t remember.
 
[Prosecutor]: Well, you just testified under oath to this jury that the next day
Jimmy Dale went down and turned himself in.
 
[Defense counsel]: I object. That is argumentative. That is not what she
testified to.

          [The Court]: Overruled.
 
[Defense counsel]: Your Honor, the question that I asked was did he turn
himself in subsequently.

          [Prosecutor]: Her response was the next day.
[To Shannon]: So you don’t know if he turned himself in the next day or the
week later?
 
[Shannon]: I just said, yes, sir, it was a few days later. Because we had to get
some things—we were trying to—they had said that he had a warrant. They
told us that, you know, contact a bond company and all of that and that’s what
we were doing. And then he turned himself in as soon as he did that.
 
          [Prosecutor]: So it was several days later, up to a week later, right?

          [Shannon]: Yes, sir.

          [Prosecutor]: Not like you said previously, correct?

          [Shannon]: Yes, sir.

Prosecutorial Misconduct 
          Appellant argues that, during his cross-examination, the prosecutor
misrepresented Shannon’s earlier testimony, “casting [her] as a liar” in an attempt to
“undermine her entire testimony [,]” which violated appellant’s due-process rights by
creating a false impression for the jury. Appellant cites Davis v. State, 831 S.W.2d
426 (Tex. App.—Austin 1992, pet. ref’d), and Duggan v. State, 778 S.W.2d 465 (Tex.
Crim. App. 1989), to support his argument that the prosecutor’s actions constituted
prosecutorial misconduct. 
          Davis and Duggan deal with far more egregious conduct than the instant case
presents and therefore provide little guidance. In Davis, the prosecutor met with a
witness at his office during a trial recess and intimidated her—at one point
threatening her with a perjury charge—into changing her testimony. Davis, 831
S.W.2d at 438–39. In Duggan, the prosecutor allowed two State witnesses to testify
falsely on cross-examination by defense counsel that they had not exchanged their
testimony for the State’s promise of leniency on their own cases. Duggan, 778
S.W.2d at 467–68.
          Even if the cases cited by appellant were more analogous to the facts before us,
prosecutorial misconduct is an independent basis for objection that must be
specifically urged in order for error to be preserved. Hajjar v. State, 176 S.W.3d 554,
566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref’d); see also Hernandez v. State,
914 S.W.2d 218, 225 (Tex. App.—El Paso 1996, pet. ref’d) (citing Huffman v. State,
746 S.W.2d 212, 218 (Tex. Crim. App. 1988) (defendant must object that the
prosecutor’s question was clearly calculated to inflame the minds of the jury and was
of such a character so as to suggest the impossibility of withdrawing the impression
produced)). Appellant’s counsel objected to the prosecutor’s aggressive cross-examination on the basis that it was argumentative because it misstated Shannon’s
earlier testimony, but he gave the trial court no indication that he felt the prosecutor’s
conduct was clearly calculated to inflame the minds of the jury and was of such a
character that it could not be cured by an instruction to disregard. In addition, no
instruction to disregard was sought.
          We conclude that appellant waived his complaint and, accordingly, overrule
his third issue.
Revocation Hearing
          In his fourth issue, appellant contends that the trial court denied him a fair
probation revocation hearing by excluding testimony from a prior hearing when
appellant attempted to introduce it.
Previous Proceeding
          Appellant was placed on five years’ probation in January of 2002 after pleading
guilty to aggravated assault. No orders were entered modifying the length of
appellant’s probation. In 2004, the State moved to revoke appellant’s probation, and
the trial court held a hearing on that motion at which appellant’s probation officer,
Cheri Davis, testified that appellant’s probationary period would end in January of
2005. 
          At the 2007 revocation hearing at issue in this case, while cross-examining
Davis, appellant’s counsel attempted to introduce Davis’s 2004 testimony into
evidence:
[Defense counsel]: Ms. Davis, when we look at the hearing that we had back
in 2004, you have had an opportunity to review that hearing transcript; is that
correct?

          [Davis]: Yes, sir.
 
[Defense counsel]: And do you recall back at that time that it was the belief of
everyone and what was represented to the Court was that he was going to come
off of probation just some months down the road?
 
[Prosecutor]: Judge, I object to speculation about what everyone believes.
What does that have to do with whether he violated probation or not?

          [The Court]: Sustained.
 
[Defense counsel]: Do you recall having previously given testimony about how
much longer he would have on probation at that time?

          [Davis]: I did read it in the transcript today.

          [Defense counsel]: And that was your testimony, correct?

          [Davis]: I’m sure it was, yes.
 
[Defense counsel]: And so at that time you were under the impression that he
only had a short time left on his probation, right?

          [Davis]: Actually I think that was my mistake.
 
[Defense counsel]: And if it’s a mistake that’s fine. But a mistake was made,
correct?

          [Davis]: Correct.
 
[Defense counsel]: And that was one of the reasons we were looking at that to
have his entire probation fees paid up by the date of that hearing and the Court
has previously ordered him to do and he had done that, correct?

          [The Court]: How is this relevant at this time?
 
[Defense counsel]: Judge, that is relevant in your taking into consideration this
young man being on probation because at the time everyone had thought, and
the testimony was, that not that he was on up until 2007 but he was getting off
the Spring of the next year. You told him—

          [The Court]: I don’t even remember any of that.
 
[Defense counsel]: You told him to have all his fees paid in full before the
hearing.

          [The Court]: That is not a part of what we are here about.

          [Defense counsel]: Well, it really is.
 
[The Court]: It really is not. I’m going to consider only what is in this amended
motion here. And please, let’s not get off into something that is not in this
amended motion to revoke.
 
[Defense counsel]: Judge, respectfully, Your Honor, if I may say that we are
not getting off into something that is not—
 
[The Court]: I think we are and I’m ruling that we are and I don’t want to hear
it. If it’s not in this amended motion to revoke probation I don’t want to hear
it.

          [Defense counsel]: That’s what I’m talking about, Judge.
 
[The Court]: You can make a Bill of Exception later on if you want to on that,
but I don’t want to hear it.

          Appellant’s counsel made a Bill of Exception, during which he explained that
Davis’s 2004 testimony gave appellant the impression that his probation would expire
in January of 2005:
[Defense counsel]: Because after the spring time of 2005, that was when
[appellant] believed, and based on the testimony and the representations that
were made in the courtroom, that he was actually going to be off probation.
Now, but subsequently find out and are aware [sic] that this probation is five
years and he was not going to be released that spring, early summer of the
following year.

          After Davis finished testifying, the trial judge asked the attorneys to “refresh
[his] memory” about the 2004 hearing. Appellant’s counsel reiterated his position that
Davis’s 2004 testimony created an ambiguity in the probation terms. The trial judge
replied:
[The Court]: Well, it [appellant’s probationary term] wouldn’t have expired
until January of 2007 would it?

          [Defense counsel]: Well, that was the mistake made, Judge.
 
           . . .
 
[The Court]: But the order that is in place now is that he would have expired
January, 2007, if he had done what he was supposed to do?

          [Defense counsel]: According to the order, that is correct, Judge.

          Appellant argues that the trial court failed to function as a “neutral and
detached hearing body” and denied him due process by “wholly fail[ing] to consider
the evidence by defense counsel” when “[t]here was some issue over when the actual
term of probation ended . . . .” In support of his contention, appellant cites two
cases—Cooper v. State, 655 S.W.2d 345 (Tex. App.—Dallas 1983, no pet.) and
Campbell v. State, 420 S.W.2d 715 (Tex. Crim. App. 1967)—addressing ambiguities
in the context of probation revocation proceedings.
Ambiguity in Terms
          We first note that Davis’s mistaken testimony at the 2004 hearing did not create
an ambiguity as to the length of appellant’s probation, as “[o]nly the court in which
the defendant was tried can fix the terms and conditions of community supervision.”
McArthur v. State, 1 S.W.3d 323, 333 (Tex. App.—Fort Worth 1999, pet. ref’d)
(citing Tex. Code Crim. Proc. Ann. art. 42.12, § 10(a) (Vernon Supp. 2008)).
Further, with one exception not applicable here,


 “only the judge may alter conditions
of community supervision [emphasis added].” Tex. Code Crim. Proc. Ann. art.
42.12, § 10(a). As the trial judge noted and appellant’s counsel acknowledged, the
order placing appellant on probation, which was admitted into evidence, specifically
states that appellant’s sentence was “probated for 5 years” beginning “January 7,
2002.” The trial judge never altered those terms, and Davis’s testimony at the 2004
hearing had no effect on them. 
          Appellant’s reliance on Cooper and Campbell is misplaced, as those cases
address ambiguities contained within a trial court’s own written description of the
terms of probation. Campbell dealt with a term in the trial court’s order that instructed
a defendant to report all changes of address but did not specify to whom. Campbell,
420 S.W.2d at 717. Cooper dealt not with an order setting the terms of probation but
with an order granting the State’s motion to withdraw its motion to revoke the
defendant’s probation. Cooper, 655 S.W.2d at 345. The order in Cooper contained
conflicting statements in parentheses regarding whether the defendant remained
subject to the terms of probation, and the trial judge did not indicate which statement
he was implementing when he signed the order. Id. at 346–47.
          We additionally note that, both before and after appellant attempted to offer
Davis’s 2004 testimony, Davis testified that appellant reported as ordered by the
probation department several times after January of 2005. Appellant’s occasional
compliance with the reporting requirement of his probation after January 2005 shows
that he was not misled by Davis’s mistaken testimony as to the expiration date of his
probation and hence strips that testimony of any relevance. See Drew v. State, 942
S.W.2d 98, 100 (Tex. App.—Amarillo 1997, no pet.); Perkins v. State, 504 S.W.2d
458, 462 (Tex. Crim. App. 1974), overruled on other grounds, Ex parte Taylor, 522
S.W.2d 479, 480 (Tex. Crim. App. 1975). 
          We disagree with appellant and conclude that the complained-of actions by the
trial judge did not deny appellant a fair hearing or due process of law. Accordingly,
we overrule appellant’s fourth issue. 
 
 
 
Conclusion
          We affirm the judgment of the trial court.
 
                                                             George C. Hanks, Jr.
                                                             Justice
 
Panel consists of Justices Keyes, Hanks, and Bland
Do not publish. Tex. R. App. P. 47.2(b).