**Opinion filed February 17, 2011**



# In The

# Eleventh Court of Appeals

_____

## No. 11-09-00140-CR

_____

## CONRAD LILLY, Appellant
## V.
## STATE OF TEXAS, Appellee

**On Appeal from the 259th District Court**
**Jones County, Texas**
**Trial Court Cause No. 9915**

## O P I N I O N

Conrad Lilly was indicted on two counts of assault on a public servant. After the trial court denied his motion to transfer the proceedings to a public courthouse, Lilly pleaded guilty and was sentenced to six years in prison. We affirm.

### I. *Background Facts*

Lilly was arraigned in the chapel of the French Robertson Unit of the Texas Department of Criminal Justice. The chapel had Bibles and a stained glass window with a cross and a representation of the Ten Commandments. Lilly learned that the next hearing in his case would also be held at the prison's chapel, and he filed a plea to the jurisdiction and a motion to transfer the proceedings to a public courthouse. Lilly argued that having hearings at the prison deprived him of his right to a public trial and that having them in a chapel violated the First Amendment.[1]

---

[1]U.S. CONST. amend. I.

The French Robertson Unit is in Jones County and is approximately thirty-six miles from Anson, the county seat. Until the early 1990s, groups of inmates charged with committing offenses while in prison were bused to the Jones County Courthouse for arraignment and other nonjury proceedings. The bus and other prison vehicles blocked the entire north side of the courthouse. Because there was no holding cell in the courthouse, one inmate at a time was taken out of the bus and into the courtroom to attend his hearing. After his hearing, the inmate was taken back to the bus to wait. Escorting an inmate to and from the courtroom required at least two TDCJ guards. Armed TDCJ guards were also posted around the outside of the courthouse, on each floor of the courthouse, and within the courtroom itself. This situation not only posed security concerns, it also alarmed local residents.

District courts must hold regular terms of court at the county seat of each county in their district except as otherwise provided by law. TEX. CONST. art. V, § 7. A county with a population of less than 30,000 may maintain a branch courthouse outside the county seat and may conduct any function that it is authorized to conduct at the main courthouse. TEX. LOC. GOV'T CODE ANN. § 292.0231 (Vernon 2005). Jones County has a population of 19,295. In the early 1990s, the county commissioner's court designated the French Robertson Unit Chapel a branch courthouse, and the State began conducting inmate proceedings there.

To enter the French Robertson Unit, visitors pass through a highway gate and a front gate. Prison guards check identification at both gates. Erica Whitney was working the front gate on the morning of Lilly's hearing. She testified that only people who had been approved by the warden were allowed to enter the Unit. She stated that each inmate was allowed a maximum of ten people on his visitors list and that this list could only be changed every six months. A person not on the visitors list would not have the warden's approval to enter. Furthermore, unaccompanied minors and former inmates within two years of their release were not allowed to enter. Officer Mullins was working the highway gate on the morning of the hearing. He testified that, in theory, a member of the public who wanted to attend a court proceeding could do so if he or she had the warden's approval to enter the Unit. Warden Cary Cook agreed that, if a person was on an inmate's visitors list, he or she could enter after being screened. If any member of the media, or someone not on an inmate's visitors list, requested permission to attend a court proceeding, the warden would have to call TDCJ administration in Huntsville to get further clarification. No one could recall anyone ever making such a request. Warden Cook stated that it would, therefore, be hard to say what would happen if someone did.

Getting to the prison chapel also requires going through a double fence with razor wire and three locked metal doors.  Visitors must take off their shoes, belts, and watches and pass through a metal detector.  Visitors are then frisked.  Many items are not allowed in the Unit, such as cell phones, cash over twenty dollars, clothing with profane language, and metal objects capable of causing a threat to unit safety or security.

Warden Cook testified that, in his opinion, a member of the public attending a court hearing at the chapel would be safer than the general public would be if the inmate's hearing were held at the Jones County Courthouse.  However, he acknowledged that there would be a potential difference between the two locations in a hostage situation.  Warden Cook explained that an inmate would not be allowed to leave the Unit with a hostage.  Every effort would be made to negotiate with the inmate, but he could not secure his release by threatening a hostage's life.

Jones County Constable Darrell North is the trial court's bailiff.  In contrast to the Unit's access rules, people who attend trials at the courthouse do not have to present an ID card or sign in before entering the courtroom, and they can carry as much cash as they wish.  Additionally, minors are allowed so long as they are not disruptive.

The trial court denied Lilly's plea to the jurisdiction and his motion to transfer.  Lilly then reached an agreement with the State and pleaded guilty to a third degree felony.  The trial court certified his right to appeal the pretrial rulings.

## II. *Issues*

Lilly raises two issues on appeal.  First, he argues that the trial court denied him his constitutional right to a public trial by holding his criminal proceedings at the prison.  Second, he maintains that the trial court violated the Establishment Clause and the Free Exercise Clause of the First Amendment of the U.S. Constitution as well as Article I, section 6 of the Texas Constitution by holding criminal proceedings in a chapel.

## III. *Did the Trial Court Err by Conducting Court Proceedings at the Prison?*

The Constitution of the United States, the Texas Constitution, and the Texas Code of Criminal Procedure all guarantee an accused the right to a public trial.  U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.24 (Vernon 2005). This right prevents the abuse of judicial power, discourages perjury, encourages unidentified potential witnesses to come forward, and instills in the public the perception that the courts are acting fairly. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569-71 (1980).  The constitutional

3

right to a public trial has been extended to some pretrial proceedings as well. *See Presley v. Georgia*, 130 S.Ct. 721, 724 (2010) (per curiam) (voir dire); *Waller v. Georgia*, 467 U.S. 39, 48 (1984) (suppression hearing).

Lilly argues that holding his trial at the Unit denied him his constitutional right to a public trial, and in the process, he challenges the constitutionality of TEX. GOV'T CODE ANN. § 24.012(e) (Vernon 2004). This provision permits a district court judge to hear a nonjury matter relating to a civil or criminal case at a correctional facility in the county in which the case is filed or prosecuted if the party to the case or the criminal defendant is confined in the correctional facility. A "correctional facility" includes a confinement facility operated by or under contract with the Texas Department of Criminal Justice. Section 24.012(e); TEX. PENAL CODE ANN. § 1.07(a)(14)(B), (C) (Vernon Supp. 2010).

When reviewing the constitutionality of a statute, we presume that it is valid and that the legislature acted reasonably by enacting it. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002); *see also* TEX. GOV'T CODE ANN. § 311.021 (Vernon 2005). The person challenging the statute must prove its unconstitutionality. *Rodriguez*, 93 S.W.3d at 69. Normally, they must also prove harm, but errors labeled by the United States Supreme Court as structural errors are exempt from harm analysis. *Gray v. State*, 159 S.W.3d 95, 96-97 (Tex. Crim. App. 2005). Structural errors are constitutional violations "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The United States Supreme Court has identified the violation of the right to a public trial as one of the limited classes of cases constituting structural error. *Johnson v. United States*, 520 U.S. 461, 468-69 (1997).

Typically, the violation of the right to a public trial occurs when the trial court takes affirmative action excluding the public or specific individuals from court proceedings. *See Presley*, 130 S.Ct. at 722 (lone observer ordered to leave voir dire); *Waller*, 467 U.S. at 42 (suppression hearing closed to all persons other than witnesses, court personnel, the parties, and the lawyers); *Andrade v. State*, 246 S.W.3d 217, 225 (Tex. App.—Houston [14th Dist] 2007, pet. ref'd) (defense counsel was ejected from the courtroom for arguing); *Mosby v. State*, 703 S.W.2d 714, 716 (Tex. App.—Corpus Christi 1985, no pet.) (members of the public were excluded during the examination of an eleven-year-old witness to the sexual abuse of a child).

Lilly does not claim that anyone affirmatively excluded the public from attending his or any other court proceedings. Rather, Lilly contends that court proceedings conducted at a prison

4

are, by definition, not open to the public. In support of this position, he cites three cases from the United States Supreme Court: *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977); and *Adderley v. Florida*, 385 U.S. 39 (1966).

In *Gannett*, the Court was confronted with claims by journalists that they had been improperly excluded from a criminal trial. A murder investigation received considerable attention from local newspapers. Three individuals were ultimately arrested, and two were charged with murder. The murder defendants filed a motion to suppress and, at the suppression hearing, asked the trial court to exclude the press and public because the press coverage was jeopardizing their ability to receive a fair trial. The district attorney did not oppose the request, and the trial court granted it. 443 U.S. at 375. The journalists argued that, even if it was appropriate to exclude the public, they had a superior constitutional right under the First and Fourteenth Amendments to attend all criminal trials. They acknowledged that the Court had previously held that the press had no greater right of access to prisons than the public but argued that there was a distinction between prisons and courts because courts were considered a public forum and prisons were not. The Supreme Court refused to determine if there was a difference between the journalists' right of access to a trial and their right of access to a prison and held that, even if they had a constitutional right to attend all criminal trials, this right was secondary to the defendants' right to a fair trial. 443 U.S. 392-93 n.24.

In *Adderley*, a group of student demonstrators entered unannounced onto the grounds of a jail to protest the arrest of fellow students and were, themselves, arrested for trespass. 385 U.S. at 40-41. The protestors argued that their actions were analogous to protests on the grounds of a state capitol, which were protected from prosecution for breach of the peace in *Edwards v. South Carolina*, 372 U.S. 229 (1963), and *Cox v. Louisiana*, 379 U.S. 536 (1965). In upholding their trespass convictions, the Court pointed out that "[t]raditionally, state capitol grounds are open to the public. Jails, built for security purposes, are not." 385 U.S. at 41. In *Jones*, the Court held that a prison was not a public forum and that prison authorities could regulate bulk mailing and meetings among inmates so long as there was a rational basis for the regulation. 433 U.S. at 133-34.

*Gannett* has no bearing on the question before us. *Adderley* and *Jones* both stand for the proposition that prisons are secure locations and, therefore, that the State has more authority to regulate or restrict speech there than it does at more public forums. This includes the authority to

limit access. But the authority to maintain a secure facility is not dispositive of Lilly's complaint because it does not account for the State's exercise of this authority. *See Levine v. United States*, 362 U.S. 610, 616-17 (1960) (whether an accused has been denied the right to a public trial is determined on the particular circumstances of each case). For example, if the State restricts unit visitors but not courtroom observers, no violation is shown. Conversely, if the State prevents the media or members of the public from attending trials, the right to a public trial is implicated.[2] Because the answer to this question turns on the State's actions, we cannot conclude, as a matter of law, that trials at prisons are or are not public trials. Instead, this issue must be addressed based upon the facts of each case.

Lilly offered no evidence that anyone was prevented from attending his trial. The public was given notice that judicial proceedings would take place at the prison – the docket was filed and posted by the trial court's coordinator almost one month previously. There was some dispute among the witnesses as to whether a member of the public not on an inmate's visitors list could attend prison court proceedings, and Warden Cook eventually admitted that he did not know how the prison would handle such a situation because no one had ever asked to do so. But of equal import was Warden Cook's testimony that, if anyone did, he would call TDCJ administration for guidance. Unless, and until, someone is actually prohibited from attending a trial, it would be speculative to conclude that they could not.

There was also no evidence that anyone was dissuaded from attempting to attend Lilly's trial because of its location. Lilly makes much of the Unit's visitor restrictions. Regrettably, heightened courthouse security procedures are becoming more commonplace at courthouses.[3] But undeniably, the Unit uses heightened security measures in comparison to those *normally* employed at the courthouse. However, heightened security measures do not necessarily deprive a defendant of a public trial. *See Hernandez v. State*, 914 S.W.2d 218, 221-22 (Tex. App.— El Paso 1996, pet. ref'd) (defendant was not deprived of a public trial when trial court required those in attendance to be photographed due to concerns about gang violence, even when one

---

[2]We do not hold that the trial court can never exclude the press or public from a trial because, for example, the court must also consider the defendant's right to a fair trial. *See, e.g., Gannett*, 443 U.S. 392-93 n.24. The court also has the authority to consider security needs. *See Mosby*, 703 S.W.2d at 716 ("limitations on pubic attendance may be imposed so long as they are no more exclusive than necessary to protect a state interest that outweighs the appellant's interest in public scrutiny of the proceedings").

[3]We note, for example, that the new federal courthouse in El Paso has limited seating in its courtrooms; visitors may not bring cell phones, computers, cameras, or other electronic devices into the courthouse; and visitors may not wait in the hallways outside the courtrooms. David Crowder, *Inside the courthouse Secure, Stunning and no cell phones allowed*, El Paso Inc., http://www.elpasoinc.com/readArticle.aspx?issueid=322&xrec=6080.

person testified that she chose not to attend because of these measures). It should also be noted that, if Lilly's trial had taken place at the courthouse, normal security protocol would not have been followed. In the past, the State stationed armed prison guards outside the courthouse, on each floor of the courthouse, and in the courtroom. The Unit's security procedures do not obviate the need for some evidence that people were prevented from attending Lilly's trial because of its location. Because Lilly produced no such evidence, he did not carry his burden to prove that Section 24.012(e) is unconstitutional.

Lilly also alleges that the Equal Protection Clause was violated by conducting nonjury proceedings involving inmates at the prison. Inmates are not a suspect class; their equal protection claims, therefore, must be reviewed under a rational basis standard. *Garcia v. Dretke*, 388 F.3d 496, 499 (5th Cir. 2004). Under this standard, disparate treatment will be upheld if it furthers a legitimate governmental interest. *Id.* The record indicates that Jones County decided to conduct judicial proceedings at the prison because of safety and security concerns. This is a legitimate governmental interest. Consequently, the Equal Protection Clause was not violated. Lilly's first issue is overruled.

IV. *Did the Trial Court Err by Conducting Criminal Proceedings in the Chapel?*

Lilly next contends that the trial court erred by conducting criminal proceedings in the chapel because this violated the Establishment Clause and the Free Exercise Clause of the First Amendment and Article I, section 6 of the Texas Constitution. Because Lilly offers no argument or authority that the protection provided by the Texas Constitution differs from that provided by the United States Constitution, we need not address his Texas constitutional claims. *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993). Similarly, while Lilly alleges a Free Exercise Clause violation, he cites to no authority in support of this argument. It is, therefore, waived. TEX. R. APP. P. 38.1(i). The question, thus, is whether the State violated the Establishment Clause.

The State responds that Lilly lacks standing because he asserted no personal injury caused by holding his proceedings in the chapel. Whether Lilly actually suffered harm is a relevant inquiry, but because Lilly is challenging his conviction, he has standing to complain about the procedures used to secure that conviction, including the use of the chapel as a courtroom.

The First Amendment, as incorporated by the Fourteenth Amendment, prohibits the states from making any law respecting an establishment of religion or prohibiting the free exercise

7

thereof. *See Everson v. Board of Educ. of Ewing Tp.*, 330 U.S. 1, 8 (1947). To determine the scope of this prohibition, we look first to the Supreme Court. Unfortunately, the Supreme Court's Establishment Clause jurisprudence has been less than clear or consistent. *See Van Orden v. Perry*, 545 U.S. 677, 692 (2005) (Scalia, J., concurring) (joining the plurality opinion "because I think it accurately reflects our current Establishment Clause jurisprudence – or at least the Establishment Clause jurisprudence we currently apply some of the time."). The Supreme Court has sometimes evaluated Establishment Clause claims using the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). Under this test, the government action must first have a secular purpose; second, its principal effect must neither advance nor inhibit religion; and third, the action must not foster an excessive governmental entanglement with religion. 403 U.S. at 612-13. At other times, though, the Court has ignored or downplayed the *Lemon* factors. *See, e.g., Marsh v. Chambers*, 463 U.S. 783 (1983) (not applying *Lemon*); *Hunt v. McNair*, 413 U.S. 734, 741 (1973) (describing the *Lemon* factors as "no more than helpful signposts").

The Fifth Circuit has suggested the use of a "reasonable observer test." *See Staley v. Harris County, Tex.*, 461 F.3d 504, 510 (5th Cir. 2006). This requires the hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment). This includes any legislative history, implementation procedure, and other historical context. *Staley*, 461 F.3d at 509-10. The dispositive question is whether this reasonable observer would fairly understand the governmental action to send a message to nonadherents that they are outsiders and not full members of the political community. *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring). Some Supreme Court Justices have, however, criticized this test as a recent and unwelcomed addition to Establishment Clause jurisprudence and have described it as fundamentally flawed and unworkable in practice. *See County of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part).

Recognizing the lack of uniform jurisprudence and cognizant of the criticisms of individuals such as Justice Kennedy,[4] we nonetheless believe that this case is best addressed with

---

[4]To illustrate the lack of consistency in the Supreme Court's Establishment Clause jurisprudence, we note that Justice Kennedy recently cited his criticism of the reasonable observer test but, nonetheless, still utilized it in *Salazar v. Buono*, 130 S.Ct. 1803, 1819-20 (2010).

the reasonable observer test because it does not concern the traditional dispute involving the placement of a religious object on public property but, rather, the confluence of multiple governmental actions. There is no dispute that the State may build, and allow inmates to use, Christian worship facilities. The question is whether the State can also use them as a courtroom.

The record does not explain why the chapel – as compared to some other facility – was designated as the branch courthouse. Thus, unlike cases such as *Salazar*, 130 S.Ct. 1803, where a Latin cross was used as a monument to honor soldiers who fell in World War I and not to evangelize, we cannot conclude that a reasonable observer would realize that the chapel was selected for reasons other than promoting a Christian message.[5] What we are left with, then, is what conclusion would a reasonable observer draw from seeing the chapel used as a courtroom?

Clearly, a reasonable observer would recognize the chapel as a Christian facility. Witnesses testified that there were Bibles in the chapel and that it was decorated with a stained glass window with a cross and a representation of the Ten Commandments. Equally clear is the precept that the mere presence of Christian symbols is insufficient to establish a constitutional violation. In *Van Orden*, 545 U.S. at 688-89, the Court noted that Moses stands holding two tablets with portions of the Ten Commandments written in Hebrew in the Court's south frieze; that statues of Moses and the Apostle Paul overlook the rotunda of the Library of Congress's Jefferson Building; and that artwork related to the Ten Commandments adorns the Jefferson Building's Great Reading Room, the Department of Justice, the Ronald Reagan Building, and a federal courthouse in Washington D.C.[6] In fact, the Court has held that a relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself be inconsistent with the Constitution. *Lee v. Weisman*, 505 U.S. 577, 598 (1992).

While not all religious displays are impermissible, the Supreme Court has found that some did violate the Establishment Clause. For example, in *McCreary County, Kentucky v. American Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005), the Court held that posting the

---

[5]In 1934, private citizens placed a Latin cross on a rock outcropping in a remote section of the Mojave Desert to honor American soldiers who fell in World War I. *Salazar*, 130 S.Ct. at 1811. The site of this monument was owned by the federal government but, by the time of this appeal, had been transferred to the VFW in exchange for other land. *Id.* at 1813. The Court recognized the religious significance of a cross, but it also noted the cross had been used as a symbol of honor and respect and found that its use as a monument to war dead evoked thousands of small crosses in foreign fields marking the graves of Americans who fell in battle. *Id.* at 1820.

[6]Religion has been closely identified with our Nation's history and government. *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 212 (1963). Thus, not only are religious symbols on government property appropriate in some instances, so too are some religious activities during governmental functions. *See, e.g., Marsh*, 463 U.S. at 792 (Establishment Clause permits a state legislature to open its daily sessions with a prayer by a chaplain paid by the State).

Ten Commandments in two county courthouses was unconstitutional. The Court's analysis indicates that what separated these displays from those previously found permissible was governmental action emphasizing the Ten Commandments' religious message. *Id.* at 868; *see also County of Allegheny*, 492 U.S. at 602 (holding a crèche depicting the Christian Nativity scene placed on the Grand Staircase of the county courthouse was impermissible). *But cf. Van Orden*, 545 U.S. at 701 (upholding the display of the Ten Commandments on the grounds of the Texas Capitol because State intended the display as a message reflecting Texans' historical ideals).

The Fifth Circuit has distinguished between permissible and impermissible religious displays by considering the larger context. For example, in *Staley*, 461 F.3d 504, the court was faced with a memorial to a Houston businessman and philanthropist. The monument included a glass-topped display case with an open Bible. *Id.* at 506. It was vandalized from time to time and, for a period of several years, contained no Bible. *Id.* In 1995, the monument was refurbished, the Bible was replaced, and neon lighting was added to the display case. *Id.* at 507. A number of ministers led prayers at the monument's rededication ceremony. *Id.* The Fifth Circuit found that the monument's original, primary purpose was to honor the contributions of a well-respected citizen whose life reflected Christian values. *Id.* at 513. The references to religion, therefore, did not violate the Establishment Clause because an objective, reasonable observer would not see the monument's purpose as predominantly religious. However, the refurbishment of the monument, when viewed in the context of the surrounding facts, reshaped its predominant message to a religious one. *Id.* at 514-15. Because the monument had become primarily a religious statement, the Fifth Circuit found that it violated the Establishment Clause. *Id.* at 515.

If the displays in *McCreary, County of Allegheny*, and *Staley* signaled a predominantly religious message to a reasonable observer, using a Christian chapel for a courtroom surely does as well. This is not to say that the State cannot use a single prison facility for multiple purposes, including religious services and judicial functions. The problem in this instance is that the chapel is unambiguously a Christian worship facility. If it is appropriate to use a Christian chapel as a courtroom, it must also be permissible to use a synagogue, mosque, or temple for the same purpose. A reasonable observer watching a trial in any of these facilities would perceive that a message supporting that particular religion was being sent to those in attendance. We

conclude, therefore, that the State violated the Establishment Clause by conducting Lilly's court proceedings in the chapel.

Courts must also be cognizant of any reverse messages an Establishment Clause violation finding sends. For example, in *Salazar*, the trial court ordered the removal of the Latin cross. The Supreme Court was concerned that this would send a message hostile to religion particularly because the land in question had been transferred to the VFW, who could simply reerect the same or a similar monument. 130 S.Ct. at 1823. In this instance, moving court proceedings to some other facility within the prison will send no such message because the chapel can still be used as a place of worship.

This does not end our analysis. The next question is whether Lilly must show harm and, if so, whether he has. Lilly argues that a violation of the Establishment Clause is structural error and, therefore, exempt from harm analysis. The Supreme Court has identified the following as structural errors: the total deprivation of the right to counsel, the lack of an impartial trial judge, the unlawful exclusion of grand jurors of the defendant's race, the denial of the right to self-representation at trial, the denial of the right to a public trial, and the submission of an erroneous reasonable-doubt instruction to the jury. *See Johnson*, 520 U.S. at 468-69. A violation of the Establishment Clause has not been labeled structural error. Thus, any error is subject to harm analysis as constitutional error under TEX. R. APP. P. 44.2. *Shelton v. State*, 41 S.W.3d 208, 218 (Tex. App.—Austin 2001, pet. ref'd).

A court of appeals must reverse a judgment of conviction or punishment for constitutional error unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Rule 44.2(a). Factors to be considered include the source and nature of the error, the extent to which the State emphasized it, probable collateral implications, and whether declaring it harmless would encourage its repetition with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). When a defendant has pleaded guilty to the offense charged, a determination of harm must focus on whether the error contributed to his decision to plead guilty. *See* Rule 44.2(a); *Sanchez v. State*, 98 S.W.3d 349, 357-58 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

There is no indication that holding court in the chapel contributed to Lilly's decision to plead guilty. Lilly was arraigned in the same chapel. At his arraignment, Lilly refused a plea bargain offered by the State. After the court held a hearing on his motion to transfer proceedings to a public courthouse, Lilly reached an agreement with the State to plead guilty. His refusal of

the State's original plea bargain offer indicates that he was not so susceptible to the religious setting about which he now complains as to be coerced into pleading guilty. Moreover, there is nothing in the record to show that he would have pleaded not guilty if the court proceeding had been held someplace other than the chapel.

Thus, we find beyond a reasonable doubt that the error did not contribute to Lilly's decision to plead guilty and that it does not require reversal. Lilly's second issue is overruled.

## V. *Conclusion*

The judgment of the trial court is affirmed.

RICK STRANGE

JUSTICE

February 17, 2011

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

12