

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00122-CR

———————————————

GLEN SAMUEL MCCURLEY, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1657724D

Before Kerr, Bassel, and Walker, JJ.
Opinion by Justice Walker

## OPINION

After two days of jury trial proceedings, Appellant Glen Samuel McCurley entered an open plea of guilty to capital murder and was sentenced to life imprisonment. McCurley appeals,[1] arguing in five issues that the trial court erred in denying his motions to suppress (1) portions of the State's DNA evidence linking him to the murder and (2) the custodial statement he made to law enforcement. We will affirm.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND

On the night of February 17, 1974, Carla Walker and her boyfriend were in a car in the parking lot of a Fort Worth bowling alley when someone yanked open the car's door, pulled Carla out, and pistol-whipped her boyfriend. Carla was kidnapped, and her body was found in a culvert three days later. An autopsy determined that she had been strangled to death and that she had likely been sexually assaulted.

The initial investigators followed up on hundreds of leads. During the investigation, a magazine from a Ruger pistol was recovered from the bowling alley parking lot. Law enforcement identified McCurley as one of a number of people in the Fort Worth area who owned such a pistol. When McCurley was interviewed, he said that his pistol had been stolen before Carla's murder. However, despite that, he had

---

[1]McCurley specifically reserved his right to appeal the trial court's denial of his motions to suppress, and the trial court certified that he had a right to appeal this issue. *See* Tex. R. App. P. 25.2(a)(2).

2

purchased a new magazine for the pistol after Carla's murder, and it appears that law enforcement was aware of that fact. Nonetheless, McCurley was given a polygraph test and released. After that, the case went cold.

In 2019, the case was reopened. From the original case file, the new investigators compiled a list of potential suspects that needed to be re-investigated; this list included McCurley. Various items recovered from the crime scene were sent to the Serological Research Institute (SERI) for DNA testing. SERI developed a single-source DNA profile belonging to an unknown male from genetic material taken from Carla's bra. After no matching profiles were found in the FBI's national DNA database, the single-source DNA profile developed by SERI was sent to Othram, a laboratory in Houston that uses a new type of DNA-analysis technology called forensic-grade genomic sequencing (FGGS). Othram used the FGGS technology to provide detectives with the surname of the unknown male who had left his DNA on Carla's bra: McCurley.

Detectives learned that McCurley still lived in Fort Worth. One night, police officers conducted a "trash run" at McCurley's house from which they took five bags of discarded trash from his front curb. They sent items from the trash to SERI for testing. From material found on a drinking straw, SERI developed a DNA profile that matched the single-source DNA profile from the material found on Carla's bra. Detectives then visited McCurley at his house, and he voluntarily provided them with a DNA sample. That DNA also matched the DNA found on Carla's bra.

McCurley was arrested and admitted to detectives that he had killed Carla. He told detectives where to locate the Ruger pistol, which officers found hidden in the ceiling in McCurley's house while executing a search warrant.

## B. PROCEDURAL BACKGROUND

McCurley was charged with capital murder and pleaded not guilty. By multiple motions, he moved to suppress the DNA evidence and his custodial statement to detectives. Regarding the DNA evidence, McCurley challenged (1) the legality of searching the DNA that was found after the search of his discarded trash without a warrant; (2) the admissibility and use of the DNA testing results produced by Othram, because the lab was not accredited by the Texas Commission of Forensic Science (TCFS) and its employees were not licensed by TCFS; and (3) the admissibility and use of the single-source DNA profile that SERI had developed, because one of the SERI lab employees involved in the testing process was not licensed by TCFS. Additionally, McCurley argued that his custodial statement was inadmissible because it was induced by a detective's promise that McCurley would not receive the death penalty if he confessed. After two suppression hearings, the trial court denied McCurley's motions. At the hearings, the trial court dictated its findings of fact and conclusions of law to the court reporter.[2]

---

[2]These findings and conclusions have been made a part of the appellate record without objection from either party. *See Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013) ("The trial court's findings of fact and conclusions of law are sufficient if they are recorded in some way, whether written out and filed by the trial court, or stated

4

Two days into the jury trial, McCurley changed his plea to guilty. The trial court found McCurley guilty and sentenced him to life in prison. McCurley appeals the trial court's denial of his motions to suppress.

## II. PRELIMINARY ADDRESSABILITY ANALYSIS

Because McCurley pleaded guilty after the denial of his motions to suppress, we must first conduct a preliminary two-pronged analysis to determine whether he is permitted to appeal the trial court's suppression rulings. *See Gonzalez v. State*, 966 S.W.2d 521, 524 (Tex. Crim. App. 1998). We must (1) identify the "fruits" that the trial court refused to suppress and (2) determine if these fruits have "somehow been used" by the State. *Id.* As to the first prong, it must be clear from the record what fruits are the subject of appellant's complaint. *Id.* As to the second prong, the State can be said to have "used" the fruits if they would have in any way inculpated the appellant. *Id.* at 523; *Jackson v. State*, 77 S.W.3d 921, 925 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

It is clear from the record that the fruits McCurley sought to be suppressed were evidence related to the DNA testing and analysis performed by Othram lab; evidence related to SERI's testing and analysis of the single-source DNA obtained from Carla's

on the record at the hearing.") (internal quotations omitted); *Busby v. State*, 253 S.W.3d 661, 669 (Tex. Crim. App. 2008) (holding that trial court complied with statutory requirement to file findings and conclusions on issue of voluntariness of defendant's confession when such were dictated into the appellate record).

bra; DNA evidence obtained from McCurley's discarded trash; and McCurley's custodial statement. *See Gonzalez,* 966 S.W.2d at 524. It is also clear that these fruits were used by the State because they would have in some way inculpated McCurley. *See id.* Accordingly, we will address the merits of McCurley's appeal.

## III. STANDARD OF REVIEW

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez,* 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State,* 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez,* 570 S.W.3d at 281.

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State,* 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *State v. Kelly,* 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

6

# IV. DISCUSSION

In five issues, McCurley complains that the trial court erred in denying his motions to suppress because (1) Othram's DNA evidence was inadmissible because Othram is not accredited by TCFS, nor has it obtained a waiver of accreditation, (2) certain of Othram's DNA evidence was inadmissible because it was analyzed by Othram employees who were not licensed by TCFS, (3) SERI's single-source DNA evidence obtained from Carla's bra was inadmissible because a portion of the lab work was completed by a SERI employee who was not licensed by TCFS, (4) the DNA profile developed from McCurley's abandoned trash was acquired without a proper warrant in violation of his Fourth Amendment privacy rights, and (5) McCurley's custodial statement was improperly induced by a promise from detectives that McCurley would not receive the death penalty if he confessed.

## A. MCCURLEY'S CUSTODIAL STATEMENT

To aid in our analysis, we will take McCurley's issues out of order. We will first address McCurley's fifth issue—that the trial court erred when it failed to suppress his custodial statement because it was improperly induced by a promise from detectives that McCurley would not receive the death penalty if he confessed to Carla's murder. We will overrule McCurley's fifth issue because the evidence supported the trial court's finding that the detectives did not make a promise to McCurley to induce his statement.

# 1. McCurley's Interview

Upon McCurley's arrest, he was interviewed by Detectives Wagner and Bennett of the Fort Worth Police Department. A videorecording of the interview captured the following conversation between McCurley and the Detectives:

Detective Bennett: This is about your credibility, Mr. McCurley. And just as Detective Wagner mentioned, it's the why. We just need to know why. And we know that you want to get this off your chest. You do want to talk about this. It's been too long. It's been too many years. Her family deserves answers. Just need you to tell us. Let her family have the peace you would want.

McCurley: Then I go to the electric chair.

Detective Wagner: You're not going to go to the electric chair.

Detective Bennett: There's no electric chair.

McCurley: Or get hung or whatever.

Detective Wagner: No, you're 77 years old. They're not going to do that to you.

Detective Bennett: No.

McCurley: Yeah, that's what y'all say now.

Detective Wagner: They're not going to do that to you. I promise you. They will not do that to you.

. . .

Detective Bennett: Her family needs the peace, Mr. McCurley. We just need the resolution.

McCurley: I can't say that I did something that I didn't do.

Detective Wagner: You know, we all have things—skeletons in our closet we don't want to talk about. We make mistakes. Anybody can understand a mistake.

McCurley:  I can't go to prison, either.  I'd just as soon go.  If it'd make anybody happier, just go ahead and kill me now.

Detective Bennett:  Nobody's going to kill you, Mr. McCurley.

McCurley:  Yeah, if you send me to prison, I will.

Detective Wagner:  Well, we're not the ones that send you to prison.  That would be up to a jury.  And that's why we say—

McCurley:  I'm saying if I did this, I haven't said I did it.  I know what all is about.  That's where I'll end up.

Detective Wagner:  And you don't think you'll end up there anyway without saying what you need to say?  I mean, wouldn't you rather make peace with things and have your final say than just blindly go off to jail?  Because I'm telling you right now, we've got enough for you to just to go to jail.  Okay?  And then if a jury finds you guilty, then you go to prison.

After this exchange, McCurley continued to maintain his innocence.  Then, Detective Wagner said the following to McCurley:

Detective Wagner:  But if you stand up and you be a good man and you show regret for what you did—that's something people can get behind.  And understand that at 77 years old, they'll wanna show mercy to somebody like that.  Nobody can promise you that, but you gotta inspire that goodness in the jury and the people that are gonna look at this case afterwards.

Ultimately, twenty-four minutes after Detective Wagner used the complained-of promise language, McCurley admitted to killing Carla by "choking" her.

At the suppression hearing, Detective Wagner explained her use of the promise language:

Defense Attorney:  And specifically, what did you promise him?

Detective Wagner: I didn't promise him anything. I mean, I was—I was making a reference—it was probably a bad choice of words, but I wasn't really promising him anything.

Defense Attorney: Well, what do you under—you think he understood that you were promising? What would have been logical for him to think you were promising?

Detective Wagner: I guess that he wasn't going to get killed.

Defense Attorney: That he wasn't going to get the death penalty, right?

Detective Wagner: We didn't use the word "death penalty." We were just talking about the methods he's talking about electrocution and hanging. And so my thought process there was they're not going to do that to you because that stuff doesn't exist. And it was another reactionary than [sic] talking about anything as far as what's going to happen death penalty-wise.

On the record, the trial court orally pronounced its findings of fact and conclusions of law:

> Once again, based on the totality of the circumstances, the Court finds that the defendant's statement was freely and voluntarily made without compulsion or persuasion. The Court notes that the detective made the statements in response to the defendant's statement, 'Then I go to the electric chair or get hung or whatever.' And in both of those instances, the detective says, 'You're not going to the electric chair. There's no electric chair. No, you're not going to be hung.' And then later also states, 'Those decisions are going to be made by a jury.'
>
> So, the Court makes a finding that all of those statements taken together did not constitute a promise or inducement to the defendant. And once again, that therefore his statement was freely and voluntarily made without compulsion or persuasion.

### 2. Relevant Law

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." Tex.

10

Code Crim. Proc. art. 38.21. A statement is involuntary if, based on the totality of the circumstances surrounding its acquisition, it is shown that the statement was induced by a promise that was "positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *Reed v. State*, 59 S.W. 3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref'd). A mere statement of fact, general statement that confessions sometimes result in leniency, or prediction about a future event does not rise to the level of a promise. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993); *Coleman v. State*, 440 S.W.3d 218, 223–24 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

### 3. The Evidence Supports the Trial Court's Finding of No Promise

The evidence supports the trial court's finding that the detectives did not make a promise to McCurley. The conversation in question began when, unprompted, McCurley raised the possibility of the death penalty, stating that he was going to "go to the electric chair" or "get hung or whatever." In direct response, the detectives stated that "[t]here's no electric chair" and that "[t]hey're not going to do that to you. I promise you." At the suppression hearing, Detective Wagner testified that she used the promise language as a rebuttal to McCurley's invocation of the specific methods of execution by electrocution or hanging because those methods are no longer used in this state. *See* Tex. Code Crim. Proc. Ann. art. 43.14(a) (providing that all executions be by lethal injection).

11

Further, McCurley continued to assert his innocence for nearly half an hour even after the promise language was used. And it is notable that, in the time between the promise language and when McCurley confessed, Detective Wagner twice made it clear that the jury alone was responsible for deciding McCurley's punishment. In fact, Detective Wagner explicitly stated that nobody could promise McCurley mercy if he regretfully confessed to killing Carla but indicated to him that a jury might take such into account when it considered his case.

When viewed in the light most favorable to the trial court's ruling, this evidence shows that Detective Wagner's promise language was merely a general statement of fact regarding the available methods of execution rather than a promise that McCurley would not receive the death penalty if he confessed to Carla's murder. This finding is dispositive of the legal issue. *See Kelly*, 204 S.W.3d at 818. As such, based on the totality of the circumstances, we hold that the trial court did not err when it denied McCurley's motion to suppress his custodial statement. We overrule McCurley's fifth issue.

## B. THE SINGLE-SOURCE DNA EVIDENCE FROM CARLA'S BRA

We will next address McCurley's third issue in which he argues that the trial court erred in refusing to suppress DNA evidence related to work completed by a SERI analyst—Erin Laurie—who was not licensed by TCFS to perform forensic analysis of DNA in Texas cases. Specifically, McCurley argues that, because Laurie completed quantification "testing" on the single-source DNA profile obtained from Carla's bra, this evidence should have been suppressed as it was obtained in violation of

12

Articles 38.01 and 38.35 of the Texas Code of Criminal Procedure. The State responds that the work performed by Laurie did not constitute forensic analysis but merely "batch work" and that the actual analysis of the test data was completed by a properly licensed analyst, Mallory Pagenkopf.

We will overrule McCurley's third issue because the trial court did not err in finding that Laurie's work was merely "batch work" and that such work did not constitute "forensic analysis" in violation of state law.

### 1. Evidence Related to Laurie's Work

Pagenkopf testified at the suppression hearing and at trial regarding the quantification work Laurie performed on the single-source DNA sample from Carla's bra.[3] She stated that one of the preliminary steps in analyzing DNA evidence is to run a quantification "test" which produces "an estimate of the amount of DNA present in" DNA extracted from a particular sample. Pagenkopf expounded that quantification involves taking a rectangular plate upon which 96 wells are located and placing inside each well an amount of DNA extract and a reagent. Then, the plate is placed on a quantification machine which causes the DNA to fluoresce, allowing SERI's software

---

[3]Because the issue of Laurie's licensing was consensually relitigated in front of the jury, our analysis will consider evidence from both the suppression hearing and trial. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996); *Siddiq v. State*, 502 S.W.3d 387, 392 (Tex. App.—Fort Worth 2016, no pet.).

to detect the amount of DNA present in each sample. These findings are then interpreted by an analyst.

Pagenkopf said that it is typical in DNA labs for parts of the quantification process to be performed by different analysts. Due to the expense of such testing, quantification is done in large batches which include DNA samples from multiple cases that are tested together. Pagenkopf likened the quantification machine to a dishwasher that is not started until it is full.

While conceding that Laurie was not licensed by TCFS, Pagenkopf emphasized that Laurie is a "fully qualified scientist." However, according to Pagenkopf, Laurie's only task related to the DNA sample from Carla's bra was to measure two microliters of DNA extract from a tube, put them in the quantification plate, and run the machine. This process did not require Laurie to examine the DNA evidence; she only needed to "check that the DNA number on the tube [was at] the correct spot on the plate." Once the machine had run, the results were returned to Pagenkopf who interpreted them.

At the hearing, McCurley proffered a list of written questions he had sent to Pagenkopf via email and her responses to those questions. The first question asked Pagenkopf to state the names of "all persons who performed a 'forensic analysis' or technical review of the evidence in this case from which a DNA profile for 'unknown male 1' or Glen McCurley was obtained." Pagenkopf provided a list that included Laurie's name and also confirmed that Laurie was not licensed by TCFS. In her answers, Pagenkopf described the work done by Laurie as "quantification . . . on the

14

DNA extracts and extraction blanks associated with" the relevant DNA samples taken from Carla's bra.

In denying McCurley's motion on this issue, the trial court found that the work completed by Laurie "consisted of doing what is called, quote, batch work, and that her portion was that she started the realtime PCR quantification machine"; it concluded that such work "did not constitute what is statutorily deemed forensic analysis."

## 2. Relevant Law

The Texas exclusionary rule excludes from a criminal trial all evidence obtained "in violation of any provisions of the Constitution or laws of the State of Texas."[4] Tex. Code Crim. Proc. Ann. art. 38.23. The Texas Code of Criminal Procedure provides that "[a] person may not act or offer to act as a forensic analyst unless the person holds a forensic analyst license." Tex. Code Crim. Proc. Ann. art. 38.01 § 4-a(b). "Forensic analyst" is defined as "a person who on behalf of a crime laboratory accredited under this article technically reviews or performs a forensic analysis or draws conclusions from or interprets a forensic analysis for a court or crime laboratory." *Id.* § 4-a(a)(2). And "forensic analysis" means "a medical, chemical, toxicological, ballistic, or other expert

---

[4]Though McCurley does not specifically invoke Article 38.23 in his appellate brief, he argued in his motion to suppress and on appeal that the bra DNA evidence should have been suppressed pursuant to Articles 38.01 and 38.35 of the Texas Code of Criminal Procedure. Thus, he has adequately raised the issue for our review. *See Imo v. State*, 822 S.W.2d 635, 636 (Tex. Crim. App. 1991) (holding that appellant "automatically invoked" Article 38.23 by arguing evidence should be excluded for violations of state constitutional and statutory law).

examination *or test performed* on physical evidence, including DNA evidence, for the purpose of determining the connection of the evidence to a criminal action." *Id.* art. 38.35(a)(4) (emphasis added). Finally, Article 38.35 expressly provides that forensic analysis of physical evidence and any related expert testimony are inadmissible if the laboratory at which the analysis was conducted was not accredited by TCFS.[5] *Id.* art. 38.35(d)(1).

### 3. The Evidence Supports the Trial Court's Findings About Laurie's Work

Under our bifurcated standard of review, we must first determine whether, when viewed in the light most favorable to the trial court's ruling, the record supports the trial court's factual finding that Laurie's work consisted only of "batch work" and starting the quantification machine. *See Johnson*, 114 S.W.3d. at 192. We hold that it does.

McCurley argues that Pagenkopf—in her written answers to his emailed questions and in her testimony—explicitly characterized Laurie's work as "forensic analysis" and a "test" of the evidence. However, according to Pagenkopf, Laurie merely placed a DNA sample from a tube onto the quantification plate, ensured that the number from the tube corresponded with the correct placement on the plate, and

---

[5]To the extent that McCurley argues that this exclusionary provision from Article 38.35 required the suppression of the bra DNA evidence, we overrule this argument. *See* Tex. Code Crim. Proc. Ann. art. 38.35(d)(1). Article 38.35 explicitly excludes evidence only if it was tested at an unaccredited lab, and it is undisputed that SERI was accredited by TCFS. *Id.*

started the machine. These tasks were only a part of the quantification test that was run in a large batch and included samples from multiple cases. Importantly, Pagenkopf confirmed that Laurie did not examine or interpret any results from the quantification data.

Accordingly, when viewed in the light most favorable to the trial court's ruling, we conclude that the record supports the factual finding that Laurie's work consisted of only "batch work" and starting the quantification machine.

### 4. Laurie's Work Did Not Constitute Statutory Forensic Analysis

Having held that the evidence supported the trial court's factual finding regarding the nature of Laurie's work, we must determine de novo whether the trial court erred in denying McCurley's motion to suppress based on its legal ruling that such work did not constitute "forensic analysis" under article 38.01. We conclude that there was no error.

McCurley contends that Laurie engaged in unlicensed forensic analysis because she performed a "test" on the bra DNA evidence when she completed her portion of the quantification; that, even though Laurie did not interpret the data, her involvement in the quantification process ipso facto constituted "testing" and required exclusion of the test results. We disagree.

"Test" in this context is an undefined statutory term, Tex. Code. Crim. Proc. Ann. art. 38.35(a)(4), and statutory construction is a question of law that we review de novo, *Lang v. State*, 561 S.W.3d 174, 180 (Tex. Crim. App. 2018). Thus, we will read

17

the term using its plain meaning "in context and . . . according to the rules of grammar and common usage." *State v. Rhine*, 297 S.W.3d 301, 310 (Tex. Crim. App. 2009). We may consult standard dictionaries to aid in our analysis. *Lang*, 561 S.W.3d at 180. Only if the plain language is ambiguous or would lead to absurd results may we consider extratextual factors. *Rhine*, 297 S.W.3d at 310.

The plain meaning of "test" as used in this context is neither ambiguous nor absurd and envisions taking an active role in analyzing and interpreting the relevant physical evidence. "Test" is a noun commonly defined as "a critical examination, observation, or evaluation." *Test*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/test (last visited Aug. 29, 2022). This definition fits squarely within the surrounding statutory context which describes a forensic analyst as a person who "technically reviews," "draws conclusions from," or "interprets" data gleaned from a forensic analysis. Tex. Code Crim. Proc. Ann. art. 38.01 § 4-a(a)(2).

Based on this plain meaning, Laurie did not perform a "test" of the bra DNA evidence. Her role was passive, requiring no critical examination, observation, or evaluation of the bra DNA evidence; she simply filled the quantification machine with batches of DNA evidence in the same way that a homeowner fills a dishwasher with dirty dishes, and then she started the machine. On the other hand, the evidence showed that it was Pagenkopf who examined and interpreted the quantification results and then provided expert testimony pertaining to those results.

Accordingly, the trial court did not err in denying McCurley's motion to suppress the bra DNA evidence because Laurie did not "test" the bra DNA evidence as contemplated by the statute and thus did not engage in unlicensed "forensic analysis" in violation of Articles 38.01 and 38.35.  See *id.* arts. 38.01 § 4-a(b), 38.35(a)(4).  We overrule McCurley's third issue.

### C.  THE DNA PROFILE DEVELOPED FROM MCCURLEY'S TRASH

Next, we will address McCurley's fourth issue—that the trial court erred by denying his motion to suppress the DNA profile developed from his discarded trash because it was obtained in violation of his Fourth Amendment right to privacy. McCurley does not contest whether the trash was abandoned nor that its warrantless seizure was improper.  Instead, he argues that the Fourth Amendment required law enforcement to obtain a warrant before using enhanced DNA-testing technology to forensically search that trash to acquire his DNA profile.  The State argues that the trial court did not err because McCurley had no expectation of privacy to any part of his abandoned trash, including the DNA profile found there.  After finding that McCurley had no expectation of privacy in his discarded trash, the trial court denied his motion as to this issue.

We will overrule McCurley's fourth issue because he did not have standing to contest the search of the abandoned trash and because, even if the trial court had erred by denying McCurley's motion to suppress this DNA profile, such error would have been harmless.

19

**1. McCurley Had No Standing to Contest the Search of His Abandoned Trash**

Property is abandoned if (1) the defendant intended to abandon the property and (2) his decision to abandon the property was not due to police misconduct. *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003). Further, no seizure occurs under the Fourth Amendment when police take possession of property that has been abandoned without police misconduct. *Id.* "[W]hen a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of the search of the abandoned property." *Id.*

McCurley concedes on appeal that he abandoned this trash. He further concedes that the police did not come into possession of the trash through any misconduct. For these reasons, the law is clear that McCurley had no standing to contest any subsequent search of his abandoned trash. *Id.*

McCurley contends that this well-established abandonment-of-property doctrine invites infringement upon a person's Fourth Amendment right to privacy when their legally obtained DNA is forensically searched without a warrant. This is particularly true, McCurley argues, given the nature of DNA as a motherlode of personal information that people inadvertently and broadly deposit in day-to-day life. He cites to a line of cases[6] to suggest that an exception should be announced to the

---

[6]McCurley cites to *Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018) (holding that warrantless search of wireless carrier databases for a defendant's physical location information typically violates their right to privacy); *Riley v. California*, 573 U.S. 373, 401, 134 S. Ct. 2473, 2493 (2014) (holding that warrantless search of cell phone obtained

abandonment doctrine for DNA-search cases. However, none of the cases cited by McCurley involved searches of unequivocally-abandoned personal property as we have here; neither do they establish that such an exception exists in Texas or, from what we can tell, any other jurisdiction in the nation.

To the contrary, at least two of our sister courts have relied on the abandonment doctrine to hold that a person does not maintain a right to privacy in DNA evidence obtained from discarded personal property. *See Pollard v. State*, 392 S.W.3d 785, 790 (Tex. App.—Waco 2012, pet. ref'd); *Guy v. State*, No. 03-12-00466-CR, 2014 WL 5423760, at *6 (Tex. App.—Austin Oct. 22, 2014, pet. ref'd) (mem. op., not designated for publication). In *Pollard*, an incarcerated defendant's DNA was obtained from a cup and spoon abandoned by the defendant in a jail cell. *Pollard*, 392 S.W.3d at 790. In *Guy*, the defendant, while incarcerated on an unrelated charge, was interviewed outside of the prison by police concerning his involvement in a murder. *Guy*, 2014 WL 5423760,

incident to arrest violated defendant's right to privacy); *Maryland v. King*, 569 U.S. 435, 464–65, 113 S. Ct. 1958, 1979–80 (2013) (holding that validly-arrested defendant's right to privacy was not offended when police swabbed for and analyzed his DNA as part of routine booking procedure); *Kyllo v. United States*, 533 U.S. 27, 40, 121 S. Ct. 2038, 2046 (2001) (holding that warrantless use of technology not in general public to search a person's home violated their right to privacy); *Katz v. United States*, 389 U.S.347, 351, 88 S. Ct. 507, 511 (1967) (holding that warrantless recording of defendant's conversation held inside a telephone booth violated their right to privacy); *Holder v. State*, 595 S.W.3d 691, 701 (Tex. Crim. App. 2020) (adopting *Carpenter* reasoning as applicable to Texas state law); *State v. Granville*, 423 S.W.3d 399, 417 (Tex. Crim. App. 2014) (holding that warrantless search of a defendant's cell phone obtained during jail book-in procedure and being held temporarily in the jail property room violated defendant's right to privacy).

at *1.  After the interview, a detective transported the defendant back to prison.  *Id.*

They stopped for a fast-food lunch on the way, after which the defendant left his fast-food trash in the detective's car.  *Id.*  Police obtained a sample of the defendant's DNA from a straw located in that trash.  *Id.*

Both courts held that—separate and apart from the defendants' diminished privacy rights as prisoners—neither defendant had an expectation of privacy to DNA evidence obtained from their abandoned personal property.  *Pollard*, 392 S.W.3d at 798; *Guy*, 2014 WL 5423760, at *6; *see also Granville*, 423 S.W.3d at 409 (clarifying that a person loses his expectation of privacy to cell phone information if the phone is abandoned); *Akins v. State*, 573 S.W.3d 290, 297 (Tex. App.—Beaumont 2019, pet. ref'd) (same regarding information from abandoned laptop).  We refuse to conclude otherwise in McCurley's case.  Accordingly, we hold that the trial court did not err in not suppressing the DNA profile developed from McCurley's abandoned trash.

## 2.  Harm Analysis for Constitutional Error

However**,** even if the trial court had erred in denying to suppress the DNA derived from the collected trash, such error would have been harmless.  The erroneous admission of evidence obtained in violation of the Fourth Amendment is constitutional error that must be analyzed under Texas Rule of Appellate Procedure 44.2(a).  Tex. R. App. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001).  Under Rule 44.2(a), "we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

*Holmes v. State*, 323 S.W.3d 163, 173–74 (Tex. Crim. App. 2009); *see* Tex. R. App. P. 44.2(a).

When a defendant pleads guilty after obtaining a pretrial ruling denying his motion to suppress evidence, the appellate court's determination of harm focuses on whether the error contributed to his decision to plead guilty. *See Holmes*, 323 S.W.3d at 174; *Lilly v. State*, 337 S.W.3d 373, 384 (Tex. App.—Eastland 2011), *rev'd on other grounds*, 365 S.W.3d 321 (Tex. Crim. App. 2012). The following factors are relevant in making this determination: the importance of the inadmissible evidence to the prosecution's case, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting material inadmissible evidence, and the overall strength of the prosecution's case. *Long v. State*, 236 S.W.3d 220, 224 (Tex. App.—Tyler 2007, pet. ref'd) citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986); *see Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010); *see also Lopez v. State*, 615 S.W.3d 238, 265 (Tex. App.—El Paso 2020, pet. ref'd) ("Furthermore, both this Court and our sister Courts have held, simply, that the erroneous admission of evidence is harmless under [Rule 44.2(a)] where it is cumulative of other evidence admitted at trial."); *Matz v. State*, 21 S.W.3d 911, 912 (Tex. App.—Fort Worth 2000, pet. ref'd) ("It is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence.").

### 3. No Harm Even If the Trial Court Erred

The DNA-profile evidence obtained from McCurley's abandoned trash was entirely cumulative and corroborated by other admissible evidence: namely, a DNA sample voluntarily provided to detectives by McCurley. This voluntary sample was used by SERI—in the same way that SERI used the trash DNA—to develop McCurley's DNA profile. McCurley has never complained that the voluntary profile was improperly obtained or otherwise inadmissible. And, just as the DNA derived from the collected trash, his voluntary sample provided a match to the SERI single-source profile found on Carla's bra; nothing in the record contradicts this fact. Due to the wholly cumulative nature of the trash DNA, it was of little actual importance to the State's case because, even had the trial court excluded it, the State could have fully relied on the voluntary sample to match McCurley to the single-source DNA profile from Carla's bra.

Further, the State's case against McCurley was strong, highlighted by the following evidence:

- McCurley had been a suspect for the entirety of the case because he owned a Ruger pistol that used the same magazine as the magazine found at the crime scene;

- McCurley told initial investigators that his pistol had been stolen before Carla's murder despite the fact that he later purchased a magazine for the same type of pistol;

- Investigators retrieved a Ruger pistol hidden in the ceiling at McCurley's residence;

24

- DNA evidence—independent of the trash DNA—linked McCurley to the murder; and

- McCurley confessed to killing Carla.

Finally, it is notable that McCurley's decision to plead guilty without a plea bargain did not directly follow the trial court's denial of his motion to suppress the trash DNA evidence. Instead, McCurley took his case to trial and entered an unnegotiated, open plea of guilty—approximately six weeks after the trial court denied his motion— only after the jury had heard two-days' worth of strong evidence against him. This indicates that his decision to plead was not influenced by the trial court's denial of his suppression motion nor a plea bargain that may have been leveraged upon that denial. *See Holmes*, 323 S.W.3d at 174 (noting close proximity between denial of motion to cross-examine experts and defendants' decision to plead as important factor to consider when determining whether the denial contributed to their decision); *Chidyausiku v. State*, 457 S.W.3d 627, 631–32 (Tex. App.—Fort Worth 2015, pet. ref'd) ("[I]f the denial of the motion to suppress contributed in some measure to the State's leverage in the plea-bargaining process and may have contributed to Appellant's decision to relinquish his constitutional rights of trial and confrontation, we cannot conclude beyond a reasonable doubt that the error did not contribute to the conviction or punishment.")

Accordingly, we conclude beyond a reasonable doubt that the trial court's denial of McCurley's motion to suppress the DNA-profile evidence obtained from his trash

25

did not contribute to his decision to plead guilty. *See Holmes*, 323 S.W.3d at 174. Thus, even if the trial court did err in failing to suppress the trash DNA, such error was harmless.

## D. DNA EVIDENCE DEVELOPED BY OTHRAM

Finally, we will address McCurley's first two issues. He argues that the trial court erred in refusing to suppress the DNA evidence and testimony generated by Othram because the lab was not accredited by TCFS and because its employees were not licensed by TCFS to perform DNA forensic analysis. The State concedes that Othram was not accredited but asserts that Othram could not obtain accreditation because the cutting-edge FGGS technology[7] that the lab employed to analyze the DNA here is not yet eligible for accreditation by TCFS. Further, the State argues that the issue of the unlicensed employees is irrelevant because Othram was not accredited and because it is unclear whether Othram's employees could even obtain licensing to perform this type of analysis. And regardless, according to the State, if the trial court erred in failing to suppress the Othram evidence, any error was harmless.

---

[7]FGGS involves looking at the entire genome through the lens of thousands of defined genetic markers scattered across it. One type of marker is DNA-SNP, which Othram uses to develop a "kit profile" compatible with various DNA websites like GEDMatch. GEDMatch collects DNA profiles from users of genetic genealogy websites like 23andMe.com and maintains a database of autosomal DNA for purposes of genealogical research. From this database, a family tree can be constructed, and Othram uses these family trees as a forensic tool.

26

We agree with the State's latter point and, assuming without deciding that the trial court erred, we will hold that any such error was harmless. *See Murkledove v. State*, 437 S.W.3d 17, 28 (Tex. App.—Fort Worth 2014, pet. dism'd) (assuming error and holding that any assumed error was harmless).

### 1. Harm Analysis for Non-Constitutional Error

When an error is non-constitutional under Rule 44.2(b), as is the assumed error here, we will disregard the error unless it affected the defendant's substantial rights. Tex. R. App. P. 44.2(b). This requires us to view the entire record and reverse only if we conclude that the error had a "substantial influence" on the outcome of the proceeding. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002) (internal quotations omitted); s*ee Sanchez v. State*, 98 S.W.3d 349, 357 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (explaining that, when a defendant pleads guilty, the proper Rule 44.2(b) analysis is whether the error had a substantial influence on the decision to plead guilty). Put differently, if we have a "grave doubt" as to whether the outcome was free from the substantial influence of the error, then the error is reversible. *Burnett*, 88 S.W.3d at 637–38. A grave doubt exists when "the matter is so evenly balanced" that we feel "in virtual equipoise as to the harmlessness of the error." *Id.*

### 2. No Harm from Any Assumed Error

We have no grave doubts about the influence of the assumed error on McCurley's decision to plead guilty. First, though it is true that the Othram evidence narrowed the detectives' investigation onto persons with the McCurley surname, it was

undisputed that McCurley was already on a list of less than twenty suspects to be re-investigated after the case was reopened in 2019. Detective Bennett testified that, even without the Othram evidence, investigators would have eventually requested a DNA sample from McCurley. In other words, Othram's analysis that led to the McCurley surname merely accelerated the detectives' narrowing spotlight on McCurley.

Additionally, as outlined above in our analysis of McCurley's fourth issue, there was overwhelming admissible evidence pointing to McCurley's guilt. *See Long*, 236 S.W.3d at 224. Chief among this evidence were the additional corroborating DNA evidence, the pistol evidence, and McCurley's confession. And, similar to the DNA evidence derived from the collected trash, the Othram evidence pointing to the McCurley surname was, in some ways, cumulative of the voluntary DNA sample provided by McCurley. Both the Othram and voluntary DNA evidence were used to confirm that McCurley's DNA was found on Carla's bra to the exclusion of others. Finally, it is relevant that McCurley's unnegotiated plea did not directly follow the trial court's denial of his motion to suppress but instead came only after the jury had heard two days of overwhelming evidence against him.

For these reasons, even if we assume that the trial court erred in denying McCurley's motion to suppress the Othram DNA evidence, we hold that any assumed error was harmless because it did not have a substantial influence on McCurley's decision to plead guilty.

## V.  CONCLUSION

Having overruled all of McCurley's issues on appeal, we affirm the judgment of the trial court.

/s/ Brian Walker

Brian Walker
Justice

Publish

Delivered:  August 31, 2022